**CITY OF STEPHENVILLE, City of Glen Rose and Somervell County, Appellants,**

v.

**TEXAS PARKS AND WILDLIFE DEPARTMENT; Julian S. Crowell; Lometa Wann; Jean Wann Edwards; Cynthia McIntire; Lois H. Crowell; Clinton McIntire; Rosamond C. Berry; Michael Clifton Allen; Dorothy Allen Tiwater; Terry McIntire; Sharon Haley; John H. Crowell; and Pauline Crowell, Appellees.**

No. 03–95–00292–CV.

Court of Appeals of Texas, Austin.

July 3, 1996.

Rehearing Overruled Sept. 11, 1996.

---

Jim Ewbank, Ewbank & Harris, P.C., Walter L. Taylor, Harris & Taylor, L.L.P., Frank R. Booth, Booth & Dillon, P.C., Austin, for City of Stephenville, City of Glen Rose and Somervell County.

Stuart N. Henry, Henry, Lowerre, Johnson, Hess & Frederick, R. James George, Jr., George, Donaldson & Ford, L.L.P., Austin, for Julian S. Crowell, et al.

Dan Morales, Attorney General, Elizabeth R. B. Sterling, Nancy E. Olinger, Assistant Attorneys General, Natural Resources Division, Austin, for Texas Parks and Wildlife Dept.

Before CARROLL, C.J., and ABOUSSIE and KIDD, JJ.

ABOUSSIE, Justice.

Appellants City of Stephenville, City of Glen Rose, and Somervell County (collectively, the "Applicants") applied to the Texas Water Commission [1] (the "Commission") for a permit to construct a dam and reservoir on the Paluxy River. Appellees Texas Parks and Wildlife Department (the "Department") and numerous Landowners (collectively, the "Landowners") contested the application. The Commission granted the permit. The Department and the Landowners filed suit in district court, seeking judicial review of the Commission's decision. The district court determined that the application was illegally granted and remanded the cause to the Commission with instructions that the Applicants refile their permit application. The Applicants appeal the trial court's judgment. We will affirm the trial court's judgment.

## BACKGROUND

In August 1982, the cities of Stephenville, Granbury and Glen Rose, and the counties of Hood and Somervell, filed Application 4237 with the Commission, seeking to build a dam and reservoir on the Paluxy River. After the application was set for hearing, the City of Granbury and Hood County withdrew from the application. In August of 1985, the three remaining applicants filed an amended Application 4237A, reflecting the change in applicants and requesting different quantities of water to be diverted.

The Department and Landowners (collectively, the "Contestants") protested the applications and participated in the contested case hearings. The Landowners own property that would be inundated by the reservoir. The Department manages Dinosaur Valley State Park which is two miles downstream from the proposed dam. The Department contends that the major attraction of the Park, ancient dinosaur tracks, would be adversely affected by reduced water flows in the Paluxy River.

The Applicants and Contestants participated in a hearing on the matter before a hearings examiner from March to September 1986. The examiner issued a proposal for decision, recommending that the permit be approved but allowing the Applicants to divert no more than 10,630 acre-feet of water per year ("af/yr") from the reservoir, one-half of the amount they had requested. All parties filed exceptions to the examiner's proposal. The Contestants protested the granting of the permit. The Applicants requested a diversion right of 17,600 af/yr, asserting that the project would not be feasible at the reduced amount and that the res-

---

1. The Texas Water Commission has since become the Texas Natural Resource Conservation Commission. Act of August 12, 1991, 72nd Leg., 1st C.S., ch. 3, § 1.001, 1991 Tex. Gen. Laws 5.

ervoir probably would not be built if the increase were not granted.

On May 12, 1987, Commissioners Roming and Hopkins considered the parties' exceptions to the examiner's proposal. Commissioner Houchins did not participate in the hearing. Roming and Hopkins voted to adopt substantially all of the examiner's proposal, except for the recommendations concerning anticipated seepage from the reservoir. Accordingly, in the "First Order" the Commissioners granted the Applicant's permit, but approved a diversion of only 12,950 af/yr.

On May 29, 1987, the Applicants and Contestants both filed motions for rehearing. The Applicants requested an increase in the diversion rights to 16,700 af/yr. The Contestants continued to protest the permit. On June 11, 1987, the Commission notified the parties in a letter that it had decided to consider the Applicants' motion. The Commission also noted that it would not consider the Contestants' motion, except as to the narrow issue of the mitigation of adverse impact on wildlife habitation. At a June 23, 1987 meeting, Roming and Hopkins voted to reverse their earlier decision as to the amount of diversion rights. Once again, Houchins did not participate in these proceedings. Based on the vote, the Commission instructed the hearings examiner to prepare an order granting the permit with a diversion right of 16,700 af/yr. Thus, the Applicants received all of the relief they had sought on rehearing.

The Commission held additional hearings in July 1987 to consider the mitigation issues raised in the Contestants' rehearing motion. Houchins participated in these hearings and voted on these matters. On September 8, 1987, the Commission issued a "Second Order," incorporating the June 23 decision and approving the permit with a diversion right of 16,700 af/yr. Both Houchins and Hopkins, but not Roming, signed the Second Order.

The Contestants filed this action in district court against the Applicants and the Commission, alleging in part that (1) the Applicants unlawfully promised Roming favors in exchange for his voting on their behalf on the rehearing motions, and (2) Roming and Hopkins illegally decided the merits of the rehearing motions without a public meeting. More specifically, the Contestants alleged that the Applicants' attorney (Booth) and the Somervell County Judge (Crump) both assured Roming that they would assist him in his efforts to be reappointed to the Commission provided that he vote in favor of the Applicants on rehearing. The Contestants also alleged that Roming and Hopkins decided to deny the Contestants' rehearing motion and grant the Applicants' motion in violation of the Texas Open Meetings Act. *See* Tex. Gov't Code Ann. § 551.002 (West 1994).[2] After a bench trial, the trial court made findings of fact that the Applicants violated Penal Code sections 36.02 (bribery) and 36.04 (improper influence), and Government Code section 551.002 (Open Meetings Act). *See* Tex. Penal Code Ann. §§ 36.02 & 36.04 (West 1994); Tex. Gov't Code Ann. § 551.002 (West 1994). The trial court also specifically denounced the conduct of the Applicants and the Commissioners. The issues in the instant appeal primarily address the procedural irregularities before the Commission, which the trial court addressed *de novo*.

In addition to alleging irregular proceedings before the Commission, the Contestants alleged that the permit process ran afoul of both administrative-procedure rules and substantive water law provisions. The trial court also made findings of fact and conclusions of law as to some of the procedure and water law issues, but declined to address others.

■ The court found that the Commission's acts of public corruption violated the Contestants' due process rights and resulted in an arbitrary and capricious decision. The trial court remanded the cause to the Commission with orders that the Applicants

**2.** The underlying events took place before September 1, 1993 and are governed by the law in effect at the time. *See* Texas Open Meetings Act ("TOMA"). Act of June 20, 1987, 70th Leg., R.S., ch. 950, § 4, 1987 Tex. Gen. Laws 3283

(amended 1989) (since codified at Tex. Gov't Code Ann. Title 5 (West 1994) (the "Code")). Because the codification does not substantively affect the law, we cite the current version for convenience.

would have to refile their application in order for it to be considered. The Applicants appeal from the trial court's judgment. The Department has filed two cross points of error[3] contending that, even if the Applicants were to prevail on their first eleven points of error, the trial court nevertheless rendered an appropriate judgment.

## DISCUSSION

In their first point of error, the Applicants allege that the evidence before the district court was legally and factually insufficient to support the trial court's findings of fact seven through twelve, finding that Booth and Crump had bribed Roming.

In deciding a no-evidence point of error, we must consider only the evidence and inferences tending to support the finding of the trier of fact and disregard all evidence to the contrary. *Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499 (Tex.1995); *Best v. Ryan Auto Group, Inc.,* 786 S.W.2d 670, 671 (Tex.1990). We will uphold the finding if more than a scintilla of evidence supports it. *Crye,* 907 S.W.2d at 499; *Seideneck v. Cal Bayreuther Assocs.,* 451 S.W.2d 752, 755 (Tex.1970); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951). The evidence supporting a finding amounts to more than a scintilla if reasonable minds could arrive at the finding given the facts proved in the particular case. *Crye,* 907 S.W.2d at 499; *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 25 (Tex.1994); William Powers, Jr. & Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 Tex. L.Rev. 515, 522 (1991).

When reviewing a fact finding to determine the factual sufficiency of the evidence, we must consider and weigh all the evidence, both in support of and contrary to the finding. We should set aside the judgment only if, after reviewing the entire record, the challenged finding of fact is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.

1986); *In Re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951); *Texas Dep't of Human Servs. v. Green,* 855 S.W.2d 136, 145–46 (Tex.App.—Austin 1993, writ denied); *Kentor v. Karotkin,* 852 S.W.2d 261, 266 (Tex.App.—Austin 1993, writ denied); *see generally* William Powers, Jr. & Jack Ratliff, *supra.*

Taken in the light most favorable to the trial court's findings, the evidence revealed the following. Shortly before the events at issue, a new Republican Governor had been elected to office. Roming, a Democratic appointee, was concerned that he would not be reappointed as Water Commissioner. At the time of the Paluxy hearings, Roming was soliciting aid in his efforts to persuade the new Governor to reappoint him to the Commission. Thinking that Booth could help him be reappointed, Roming asked Booth to assist in his political efforts.

On May 12, 1987, immediately after the first hearing before the Commissioners, Roming, George Fore (a Commission employee), Booth, and some other attorneys working on the Paluxy matter met at the Austin Club. The next day, Crump discussed Roming's situation with Booth over the telephone and prepared a letter to the Governor, recommending Roming for reappointment. Within three days, Crump prepared a letter to a state senator recommending Roming's reappointment and sent both these letters to Roming at the Commission in a letter marked "Personal and Confidential."

On June 17, 1987, after receiving Crump's letters and the Applicants' Motion for Rehearing, Roming contacted Booth to arrange a meeting to discuss Roming's political ambitions. They met later that day at the Austin Club and discussed Roming's reappointment efforts. Booth paid for the meal and drinks, charging the bill to his law firm's general expense account. Booth also billed his clients 2.7 hours of legal fees that afternoon for working on the Paluxy case.

---

**3.** A *cross* point of error alleges error in the trial court inuring to the detriment of the appellee. Because the Department does not allege that the trial court erred, its additional points are not properly termed cross points of error. However, because the Department has referred to them as cross points, so shall we.

At the June 23, 1987 hearing, Roming read from a previously prepared order which rescinded the Commission's First Order and granted all of the Applicants' requested relief. The hearings examiner who originally heard the case testified that the Commission's decision to reverse itself was highly unusual:

A: [I]n most cases where the Commission is going to grant a motion for rehearing there's some inkling or some sort of clue that it's about to come down, perhaps, based upon statements made on the record by the Commissioners.

\* \* \*

Q: ... What I'm trying to drive at is, this just came like Thor out of the clouds, without any kind of indication one way or the other that was going to happen, and that's unusual?

A: Yes, I was surprised.

The day after the June 23, 1987 hearing, a fire alarm went off at the Commission's office building and the building was evacuated. While people were standing around the building, Commissioner Houchins stated to Max Woodfin and Susan Rief that Roming had reversed his vote on the Paluxy case because of Booth's aid in his reappointment efforts.

Woodfin, a former Commission employee, testified about his conversation with Houchins:

[Houchins] walked up and said—made some remark along the lines of, "Can you believe what Ralph [Roming] is doing to me on this Paluxy case," and then began to explain or to tell me that Commissioner Roming was not going to vote the way Commissioner Houchins wanted him to vote because Mr. Roming had been convinced by Frank Booth that if he voted for Mr. Booth's side in the case that Mr. Booth could either get him reappointed or help him get reappointed to the Commission.

Woodfin also testified that he knew Houchins well enough to tell when he was joking and that, on this occasion, he was not joking. Rief, a Parks and Wildlife Department employee working on the Paluxy case, testified:

And essentially [Houchins] said something to the effect that he thought the hearing was a joke or the hearing was a sham, and I asked him what he meant by that, and he indicated that Commissioner Roming had changed his vote because he believed that if he did that[,] Mr. Booth would be able to help him get reappointed to the Texas Water Commission.

At trial, Houchins testified that he told Woodfin that the Commission's original decision in the First Order (in which he did not participate) was correct and that the Applicants' arguments on rehearing were a "bunch of clap trap."

Given the record, we cannot say that there was no evidence to support the trial court's findings that Booth and Crump improperly influenced Roming into voting in their favor. Moreover, we cannot say that such findings are so contrary to the overwhelming weight of the evidence as to be manifestly improper or unjust. Therefore, we overrule point of error one.

■ In their third point of error, Applicants allege that the evidence was legally and factually insufficient to support the trial court's findings of fact thirteen and fourteen, finding that Hopkins and Roming had reached their decision on the parties' motions for rehearing in violation of the Open Meetings Act. *See* Tex. Gov't Code Ann. § 551.001 *et seq.* (West 1994).

Section 551.001 of the Texas Open Meetings Act provides in pertinent part:

(2) "Deliberation" means a verbal exchange during a meeting between a quorum of a governmental body ... concerning an issue within the jurisdiction of the governmental body or any public business.

(3) "Governmental Body" means:

. . . .

(D) a deliberative body that has rulemaking or quasi-judicial power and that is classified as a department, agency, or political subdivision of a county or municipality;

. . . .

(4) "Meeting" means a deliberation between a quorum of a governmental

body ... during which public business ... is discussed. ...

....

(6) "Quorum" means a majority of a governmental body, unless defined differently by applicable law or rule or the charter of the governmental body.

Tex. Gov't Code Ann. § 551.001 (West 1994).

Section 551.002 of the Texas Open Meetings Act provides in pertinent part:

Every regular, special, or called meeting of a governmental body shall be open to the public. ...

*Id.* § 551.002.

Taken in the light most favorable to the trial court's findings, the evidence revealed the following. After the Commission issued its First Order on May 12, 1987, the Applicants filed a rehearing motion seeking to increase the amount of water they could divert under the permit. The Contestants also filed a motion for rehearing, raising a host of issues challenging the Commission's granting of the permit. On June 11, 1987, the Commission through its General Counsel sent a letter to the parties stating its decision to consider (1) "Those portions of the Motion for Rehearing filed by Texas Parks and Wildlife Department and the Protestant Landowners which address the issue of mitigation plans," and (2) "All issues raised in the Motion for Rehearing filed by the applicants, City of Stephenville, et al." The letter also stated: "The Commission is planning to rule on the pleadings that have been filed and will not be entertaining new arguments; however, the Commission retains the privilege of questioning the parties on the above-mentioned issues." Thus, with the June 11 letter, the Commission notified the parties that they had impliedly overruled nearly all of the Contestants' complaints on rehearing. Roming testified that the decision communicated in the June 11 letter to deny nearly all of the Contestants' rehearing motion was final. Moreover, the evidence reveals that this decision was made without a public meeting.

The Applicants argue that there was no violation of the Open Meetings Act because the evidence is insufficient to show that Rom-ing and Hopkins communicated with each other and reached a mutual decision. Instead, the Applicants argue that each Commissioner (1) reached the identical decision completely on his own without conferring with one another; and (2) each independently informed the Commission's general counsel in a "straw poll" of his informal opinion on the motion. Therefore, according to the Applicants, there could be no violation of the Open Meetings Act because there was never any deliberation among the Commissioners.

Given the detail of the June 11 letter, it would be highly improbable that the decision was made without any communication, direct or indirect, between Roming and Hopkins. For the Commissioners to have reached the decision independently, both Roming and Hopkins would have had to make at least seven separate decisions and communicate them to the General Counsel: (1) grant hearing on all of the issues in the Applicants' rehearing motion; (2) grant hearing on only the mitigation issue in the Department's rehearing motion; (3) grant hearing on only the mitigation issue in the Landowners' rehearing motion; (4) deny all other issues raised by the Department's rehearing motion; (5) deny all other issues raised by the Landowners' rehearing motion; (6) not hear any argument on the issues for which a hearing was granted; and (7) reserve the right to question the parties on the issues for which rehearing was granted.

Furthermore, hearings examiner Dickman testified that, in order to reach the decision stated in the June 11 letter, the Commissioners had to have discussed the merits of the case with each other. He also testified that there had been no open meeting before the decision set out in the June 11 letter.

■ Applicants further argue that there can be no Open Meetings Act violation because the June 11 letter in no way evidenced that the Commissioners had decided to deny the Contestants' rehearing motion. Instead, Applicants contend, the Commissioners merely set some issues on the agenda for a hearing, while allowing others to be overruled by operation of law. Because a motion for rehearing can be overruled by operation of law without a meeting, Applicants argue

there could have been no "illegal" meeting and hence no Open Meetings Act violation. Applicant's argument is misplaced. A motion for rehearing may be overruled by operation of law due to an agency's inaction. Here, however, the Commission did act. The Commission sent a notice to all parties involved indicating that it had decided to consider some of the parties' complaints to the exclusion of all others.

Based on the record evidence, we cannot say there was no evidence to support the trial court's findings that the Commissioners conferred with each other about the disposition of the rehearing motions without a public hearing. Moreover, we cannot say that such findings are so contrary to the overwhelming weight of the evidence as to be manifestly improper or unjust. The evidence was both legally and factually sufficient to support the trial court's finding that Roming and Hopkins communicated with each other about the parties' rehearing motions without a public hearing. Therefore, we overrule point of error three.

■ In their second point of error, the Applicants contend that the evidence was legally and factually insufficient to support the trial court's findings of fact fifteen and sixteen, finding that the Contestants were substantially harmed by the Commission's impropriety.

Applicants maintain that even if the Second Order were tainted by any procedural impropriety, the order granting the permit should stand nonetheless because the Contestants cannot show any harm. Applicants contend that the Contestants' harm, if any, would derive from the reservoir being built under the First Order and not from any marginal increase in water diversion under the Second Order. According to the Applicants, the impropriety alleged could only have affected the Second Order, not the First. Therefore, the Contestants could not have suffered any harm stemming from their allegations.

The Contestants respond that they indeed will suffer water inundation stemming from the consequences of the Second Order alone. The Contestants argue that the reservoir was not economically feasible under the First Or-

der. Therefore, because the project would never have been built under the First Order, the Second Order's marginal increase in water diversion rights, making the project feasible, will cause them harm independent of the First Order.

Taken in the light most favorable to the trial court's findings, the evidence revealed that, without the additional increase in diversion rights afforded under the Second Order, the reservoir would not be economically feasible and would likely never be built. It is undisputed that the Second Order made the project more feasible than the First Order. The hearings examiner's proposal for decision recommended granting the permit with an annual diversion rate of 10,630 af/yr. The Applicants filed exceptions to the proposal, arguing that the project was economically unfeasible at that rate of diversion. The Commission's First Order permitted Applicants to divert no more than 12,950 af/yr. Once again believing that the project was economically unfeasible at this rate, upon motion for rehearing the Applicants vigorously sought to increase the diversion rights to 16,700 af/yr. The Commission's Second Order permitted a diversion rate of 16,700 af/yr.

Hopkins testified that he did not believe the project was feasible at all under the First Order. Dickman, the hearings examiner, testified that a substantial reduction below 15,900 af/yr would jeopardize the project's feasibility. Booth predicted that the project would never be built at 10,630 af/yr. While he offered no opinion as to whether the project was feasible at 12,950 af/yr, Booth stated that the project was undoubtedly more feasible at 16,700 af/yr.

In sum, the record contains ample evidence to show that the project would likely never be built under the scope of the First Order. Moreover, we cannot say that such findings are so contrary to the overwhelming weight of the evidence as to be manifestly improper or unjust. Therefore, any procedural impropriety in the Second Order substantially increased the likelihood that the project would be built. Accordingly, we must examine the evidence of harm to the

Contestants stemming from construction of the reservoir.

The harm to the Landowners if the dam and reservoir were built is undisputed. Much of the Landowners' property has remained in the family for over a hundred years since their ancestors originally came to the area from Tennessee in the mid-nineteenth century. Were the project to be built, much of the Landowners' property, including a family cemetery, would be flooded.

On behalf of the Department, Park Planner John Williams and Conservation Biologist David Riskind testified to the harm the Department would suffer were the project to be built. The Department manages Dinosaur Valley State Park which is the only state park in Texas and only one of two public parks in the United States with extant dinosaur tracks. Both Williams and Riskind testified that the natural flow of the Paluxy River protects the existing dinosaur tracks from freeze damage in winter and helps uncover new tracks in spring. When water seeps into the porous rock containing the tracks and then freezes, the resulting expansion cracks the rock, eventually causing the tracks to wash away. Under an ideal flow rate, the top level of the water may freeze, but the water beneath the surface remains fluid, protecting the tracks from freeze damage. Williams testified that, if the river flow were altered according to the scope of either the First or Second Order, the dinosaur tracks would be more vulnerable to freeze damage in winter. Furthermore, the natural flow of the river erodes the riverbanks in the spring, exposing new tracks. According to Riskind, if the river flow were altered, it would jeopardize the river's ability to uncover new tracks.

Given the record, we cannot say that there was no evidence to support the trial court's findings that the Commission's Second Order prejudiced substantial rights of the Contestants. Moreover, we cannot say that such finding are so contrary to the overwhelming weight of the evidence as to be manifestly improper or unjust. Therefore, we overrule point of error two.

■ In their fourth point of error, the Applicants allege that the trial court erred in permitting two witnesses to testify at the district court hearing because the Contestants had not sufficiently identified the witnesses in pretrial discovery. Specifically, the Applicants contend that the trial court should not have permitted Max Woodfin, Susan Rief, and Steven Dickman to testify because the Contestants' discovery responses (1) did not include the witnesses' telephone numbers, or (2) notify the Applicants of the witnesses' change of business address shortly before trial.

At all relevant times to this cause, Dickman was a hearings examiner for the Commission. At the time of the events underlying the dispute, Woodfin was also employed at the Commission, while Rief was employed by the Department. Some time thereafter, both Rief and Woodfin began work at the Texas Department of Agriculture ("TDA"). In response to the Applicants' interrogatories, the Contestants identified Dickman as a potential witness and provided his business address at the Commission, a defendant in the action. In response to interrogatories, the Contestants identified Rief and Woodfin as potential witnesses and provided their business addresses at the Texas Department of Agriculture; the Contestants also provided Rief and Woodfin's home addresses in response to deposition questions. Dickman's business address and Rief and Woodfin's home addresses were current up until trial. Rief and Woodfin's business addresses were current up until three weeks before trial. The responses did not contain the potential witnesses' telephone numbers. However, the trial court took judicial notice of the Southwestern Bell Austin Area Telephone Book which contained Rief and Woodfin's home phone listings.

In general, according to the Texas Rules of Civil Procedure, a party responding to discovery generally has a duty to supplement only when "(1) he knows that the response was incorrect or incomplete when made; [or] (2) he knows that the response though correct when made is no longer true and complete and the circumstances are such that failure to amend the answer is in substance misleading." Tex.R. Civ. P. 166b(6). Furthermore, Rule 215(5) mandates that when a

party fails to properly supplement a discovery request, the evidence shall be excluded absent good cause sufficient to require admission of the evidence. Tex.R. Civ. P. 215(5). Before examining whether "good cause" exists under Rule 215, we must first determine whether Rule 166b required the Contestants to supplement their responses.

The responses were correct when given. Therefore, the duty to supplement could only arise if the surrounding circumstances had changed such that the responses became misleading. *See* Tex.R. Civ. P. 166b(6)(2). Under very similar circumstances in *Federal Deposit Insurance Co. v. Mediplex, Ltd.*, 889 S.W.2d 464 (Tex.App.—Houston 1994, writ dism'd by agr.), the court ruled that it was an abuse of discretion *not* to allow the witnesses to testify. In *Mediplex,* the FDIC provided the names and addresses, but no telephone numbers, of two witnesses in an interrogatory response. The FDIC also provided the name, address, and telephone number of a third witness in a response to a request for production. The trial court excluded the testimony of all three witnesses. Reversing the judgment, the appellate court found that the FDIC's responses were in no way misleading and that the trial court abused its discretion in excluding the witnesses' testimony. The court reasoned that interrogatory responses referring to other discovery responses and the failure to list telephone numbers were in no way misleading. *Id.* at 466.

Likewise, in the instant cause, we fail to see how the discovery responses were in substance misleading. At all relevant times Dickman was an employee of the Commission. Therefore, as co-defendants with his employer, the Applicants had continued access to Dickman. Furthermore, the Applicants had ample time to contact Rief and Woodfin. Indeed, Rief and Woodfin gave deposition testimony, and Applicants' counsel attended and cross-examined them. Even though the Contestants' discovery responses did not include the witnesses' telephone numbers, presumably the Applicants had access to a telephone book. As in *Mediplex,* we fail to see how the Applicants were misled or surprised. Accordingly, the trial court did not abuse its discretion in permitting the witnesses to testify. We overrule point of error four.

█ In their fifth point of error, the Applicants allege that the trial court erred in admitting Rief and Woodfin's testimony concerning Commissioner Houchins' statements because the evidence constituted inadmissible hearsay. As recounted earlier, while waiting outside the agency building during a fire alarm, Houchins told both Rief and Woodfin that Roming voted in favor of the Applicants in order to enlist their aid in his reappointment efforts. The Applicants contend that Roming made a statement to Houchins who in turn made a statement to Rief and Woodfin. Therefore, Applicants argue, Rief and Woodfin's testimony constituted double hearsay. *See* Tex.R. Civ. Evid. 805.

First, we note that the record does not support Applicants' version that these statements were *double* hearsay. Houchins did make out-of-court statements to Rief and Woodfin, posing a potential hearsay issue. However, the record does not suggest that Houchins' statement was based upon or recounted an earlier statement by Roming. Houchins did tell Woodfin and Rief that he thought the permit process was corrupted. Yet, the record does not reflect how Houchins obtained this information; he did not testify that Roming made any statement to him concerning the permit process.

█ The Contestants argue that Houchins' statements were adoptive admissions by a party opponent, and thus not hearsay. The Texas Rules of Evidence provide that "[a] statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship." *See* Tex.R. Civ. Evid. 801(e)(2)(D). As long as the statement is made during the agency relationship and concerns a matter within the scope of agency, the statement is admissible against the principal even though the agent had no authority to speak for the principal. *Fojtik v. First Nat'l Bank,* 752 S.W.2d 669, 672 n. 3 (Tex. App.—Corpus Christi 1988), *writ denied per curiam,* 775 S.W.2d 632 (Tex.1989); 33 Steven Goode, Olin G. Wellborn III & M. Mi-

chael Sharlot, Guide to the Texas Rules of Evidence: Civil and Criminal § 801.11 (Texas Practice 1988).

Houchins' statement was offered against the Commission, a party to the suit. At the time the statement was made and during the time of the statement's subject matter, Houchins was, as Commissioner, an agent of the Commission. Therefore, the only remaining issue is whether Houchins' statement concerned a matter within the scope of his agency.

The statement concerned the proceedings before the Commission governing the Applicants' permit application. The Applicants argue that Houchins' statement did not concern a matter within his agency relationship because he did not participate in the May 12 or June 23 hearings. However, Houchins did sign the September 1987 Second Order granting the Applicants' requested relief, which was part of the subject matter of the alleged hearsay statement. Furthermore, Houchins did participate and vote in the July 1987 hearings on the permit concerning the mitigation issues raised in the Contestants' motion. Given Houchins' level of involvement in the proceedings, we cannot conclude that the trial court erred in finding that Houchins' statements were within the scope of his agency relationship, and therefore admissible as a party admission.

■ Furthermore, as already noted, we have concluded that Rief and Woodfin's testimony presented a "single hearsay" and not a "double hearsay" issue because the record does not reveal that Houchins repeated a statement made to him by Roming. However, even if Houchins' statement could be construed to relate a statement by Roming, we conclude that any such statement would also be an admission by a party opponent. Roming was also an agent of the Commission and participated extensively in the Paluxy proceedings. Because both statements would be party admissions, the witnesses' testimony was not inadmissible double hearsay under

4. The underlying events took place before September 1, 1993 and are governed by the law in effect at the time. *See* Texas Administrative Procedure and Texas Register Act ("APTRA"). Act of May 28, 1987, 70th Leg., R.S. ch. 221, § 2,

Rule 805. *See* Tex.R. Civ. Evid. 805. Accordingly, we overrule point of error five.

■ In point of error six, the Applicants complain that the trial court erred in granting an improper remedy. The trial court remanded the cause to the Commission with instructions that the Applicants must refile their permit application for it to be considered. Applicants complain that the trial court only had the authority to offer a general remand and that the court's additional instructions caused it to improperly "render" an order.

In support of their argument, Applicants principally rely on *Public Utility Commission of Texas v. GTE–SW, Inc.,* 833 S.W.2d 153 (Tex.App.—Austin 1992) ("*GTE*"), *reversed in part on other grounds,* 901 S.W.2d 401 (Tex.1995). In *GTE,* the trial court found that the Public Utility Commission ("PUC") had prejudiced GTE's substantial rights in violation of section 2001.174 of the Administrative Procedure Act. Tex. Gov't Code Ann. § 2001.174 (West 1996).[4] The trial court remanded the cause to the Commission and directed the PUC "to implement a surcharge that would allow [GTE] to recover any sums previously refunded by [GTE], together with 'interest and other costs associated with such refund.'" *GTE,* 833 S.W.2d at 174.

■ We held that a district court impermissibly "modifies" an agency order when, on remand, it directs the agency to incorporate certain terms into the order. The judiciary cannot modify an agency order without usurping the agency's authority and thereby violating the separation of powers doctrine. Therefore, we concluded that the trial court's instructions to the PUC on remand amounted to an impermissible "modification" of the Commission's order. *Id.* at 174–75.

We find *GTE* distinguishable from the instant cause. Commenting on the impropriety of the Applicants' behavior, the trial court stated in its written decision:

1987 Tex. Gen. Laws 1510 (amended 1989) (since codified at Tex. Gov't Code Ann. Title 10 (West 1996) (the "Code")). Because the codification does not substantively affect the law, we cite the current version for convenience.

The taint on the decision-making process in this case so permeates the final order that the final decision simply cannot stand, and there must be some consequence to the applicants for their misconduct. The principle utilized by the Court is that because the applicants tainted the permitting and decision-making process by attempting to obtain a permit unfairly and outside the rules, they should be required to start the permitting process all over again by filing a new application, should they desire to do so, and obtaining a new hearing.

The trial court did not render a final decision on the permit in whole or in part. The Applicants are still free to seek the permit, and there is nothing in the court's order that dictates the substantive contents of any permit that the Commission may wish to grant at a later date. Therefore, unlike the trial court in *GTE*, the district court has not attempted to modify the Commission's order by dictating substantive changes to the permit order. The district court has left all decisions about the scope and details of the permit to the Commission and has not usurped any agency authority.

In *Lewis v. Guaranty Federal Savings and Loan Association*, 483 S.W.2d 837 (Tex. App.—Austin 1972, writ ref'd n.r.e.), this Court had the opportunity to consider the appropriate remedy on remand in light of improper acts which tainted the impartiality of an administrative hearing. There, the banking commissioner conducted an *ex parte* investigation concerning an application to charter a savings and loan association. The trial court found that the *ex parte* communications tainted the integrity of the proceedings and affronted the protestants' due process rights to an impartial administrative hearing. This Court noted:

> The Savings and Loan Commissioner, as an administrative officer having the duty to conduct hearings and make decisions affecting the rights of adversary parties, is positioned as the judge of a court. Each is charged with the solemn trust to act fairly and impartially in fulfilling invested duties in the governmental household of the public. Each must act with genuine even-handedness, compelled by a firm and continuous desire to render to everyone that which is his due, and to shun any conduct tending to undermine faith and confidence in the man or the office in which he acts.

*Id.* at 843. To remedy the due process violations, the trial court remanded the cause to the agency with instructions to deny the application. In fact, the protestants requested that the trial court *permanently* disqualify the applicants from obtaining a charter. *Id.* at 844. The trial court refused to disqualify the applicants from obtaining a charter, noting that the record only supported an appearance of impropriety, not actual impropriety. Instead, the trial court simply remanded the cause to the agency with instructions to deny the application.

As in the instant cause, the applicants in *Lewis* argued that the trial court's instructions to deny the application amounted to an impermissible attempt to "write an administrative order" in violation of the separation of powers doctrine. Defending the trial court's actions, we noted:

> The courts, and not the administrative agencies, are empowered to decide whether substantial justice has been denied a party to the controversy. Having decided that the appellees in this case were denied due process in the administrative proceeding by the Commissioner, the court gives its judgment practical effect and enforcement when it instructs the Commissioner to perform an act for which under the law there is no alternative. The court has not usurped any discretionary or supervisory powers of the Commission, nor has it sought to perform any of the duties of the Commissioner.

*Lewis*, 483 S.W.2d at 844. The reasons justifying the remand in the instant cause are even more compelling than in *Lewis*. The trial court in *Lewis* justified its grant of relief based on the *appearance* of impropriety. In the instant cause, the trial court found *actual* impropriety. Seeing no reason to abandon our holding in *Lewis*, we hold that the trial court did not err in remanding the cause to the Commission with instructions that the Applicants must refile their application in order to seek a permit. We overrule point of error six.

In points of error seven through thirteen, including thirty-eight sub-points under point thirteen, Applicants raise various complaints addressing the trial court's review of many of the substantive issues raised in the proceeding below. In overruling Applicants' points of error one through six, we have held that, based on the Applicants' conduct, the trial court did not err in remanding the cause with instructions to refile. Therefore, we need not address points of error seven through thirteen.

The Department has filed two cross points of error contending that, even if the Applicants were to prevail on their first eleven points of error, the trial court nevertheless rendered an appropriate judgment. Because we have overruled the Applicants' first six points of error, and declined to reach the remaining ones, it is unnecessary to reach the Department's cross points of error.

## CONCLUSION

We affirm the trial court's judgment.