# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-23-00100-CV

---

**Texas Health and Human Services Commission, Appellant**

**v.**

**Julius Kadia, Appellee**

---

### FROM THE 345TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-20-003118, THE HONORABLE JESSICA MANGRUM, JUDGE PRESIDING

---

## O P I N I O N

The Health and Human Services Commission appeals an interlocutory order denying its combined plea to the jurisdiction and motion for summary judgment (the motion to dismiss) and related evidentiary rulings in this suit brought by Julius Kadia for workplace discrimination and retaliation under the Texas Commission on Human Rights Act (TCHRA).[1] *See generally* Tex. Lab. Code §§ 21.001–.556; *Jones v. Texas Dep't of Pub. Safety*, No. 03-20-00615-CV, 2022 WL 318585, at *1 n.1 (Tex. App.—Austin Feb. 3, 2022, no pet.) (mem. op.) (naming of TCHRA). In five issues, some with discrete subparts, the Commission mounts a jurisdictional attack on Kadia's claims, maintains that he both failed to establish a

---

[1] *See* Tex. Civ. Prac. & Rem. Code § 51.014(a)(8) (interlocutory jurisdiction for denial of government-unit plea to the jurisdiction); *Dallas Cnty. Hosp. Dist. v. Kowalski*, No. 05-21-00379-CV, 2023 WL 2782312, at *3–5 (Tex. App.—Dallas Apr. 5, 2023, pet. pending) (mem. op.) (reviewing evidentiary issues in interlocutory appeal of denial of government-unit plea to the jurisdiction).

prima-facie case for his claims and failed to rebut the Commission's proffered legitimate reasons for its actions, and says that the trial court abused its discretion by refusing to exclude certain evidence. We affirm in part, reverse in part, render judgment dismissing some of Kadia's claims, and remand for Kadia to replead others and for further proceedings.

**BACKGROUND**

Kadia has for many years worked for the Commission at its State Supported Living Center (SSLC) in Denton. Commission SSLCs provide residential services and support to people who have intellectual or developmental disabilities. Kadia began working at the Denton SSLC in August 2016 as a direct support professional. He is a Black man of Cameroonian origin and legally authorized to work in the United States.

Kadia obtained licensure as a Licensed Vocational Nurse (LVN) in August 2017. LVNs make more money than do direct support professionals, and the Commission is frequently in need of more LVNs, as it is a discipline in "critical shortage," according to Commission documents. From 2017 to 2022, Kadia applied for over four dozen LVN positions in Commission job postings. Only in April 2022 was he promoted from direct support professional to LVN.

From 2017 to 2019, Kadia complained to the Commission's Civil Rights Office about racial or national-origin discrimination or retaliation, and he has otherwise raised similar informal complaints to supervising personnel within the Commission. Many of the allegations in the formal complaints were resolved by mediation with supervising personnel. But as time wore on, Kadia felt that some of his complaints were not being properly addressed. On July 29, 2019, he filed an administrative Charge of Discrimination with the relevant state agency, alleging discrimination and retaliation, and in 2020, he received a "right to sue" letter stemming from the

2

administrative charge. He continued applying to Commission LVN job postings both before and after filing this charge. He filed his original petition in this suit in June 2020.

In September 2020, Kadia made an allegation of abuse or neglect of a patient by one of the other professionals at the Denton SSLC. A short time later, a similar allegation was made against him, and he was temporarily reassigned to perform his job duties in a room at the Denton SSLC that employees refer to as the "facility jail." Commission policies dictate that employees be reassigned to the room while they are the subject of an internal abuse-or-neglect investigation. Once the investigation into Kadia ended without finding any wrongdoing by him, Commission supervisors nevertheless required Kadia to remain reassigned to the "facility jail" for about a month longer. But when Kadia applied for a temporary restraining order as part of this suit, Commission supervisors the next day released Kadia back to his normal work duties. About two weeks later, on November 2, 2020, Kadia filed his second administrative Charge of Discrimination with the relevant state agency, alleging both discrimination and retaliation.

Kadia's live petition alleges many discrete acts of unlawful discrimination or retaliation. Then in the sections of his live petition in which he pleads his "Cause[s] of Action," he pleads both "discrimination in violation of Texas Labor Code" and "retaliation in violation of Texas Labor Code." (Formatting altered.) To support the discrimination claims, he pleads:

> He has consistently been denied promotions and subjected to a hostile work environment because of his race and national origin. Other employees, particularly white employees and employees of American origin, were treated significantly more favorably. The defendant's discriminatory treatment violates chapter 21 of the Texas Labor Code, and has deprived Kadia of wages, employment benefits, and promotional opportunities, and has caused Kadia to suffer mental anguish and emotional distress. Kadia's discrimination claim based on the defendant's failure and refusal to promote him is limited to the defendant's failure and refusal to promote him during the periods of January 30, 2019, through July 29, 2019, and May 6, 2020, through November 2, 2020.

3

Then to support his retaliation claims, he pleads:

> Kadia engaged in protected activity when he opposed discriminatory and retaliatory treatment based on his race and national origin. Kadia has repeatedly been denied promotions and compensation and subjected to a hostile work environment in retaliation for his complaints about discrimination and retaliation. The defendant's retaliatory actions violate the Texas Labor Code's anti-retaliation provision, and have deprived Kadia of wages, employment benefits, and promotional opportunities, and caused Kadia to suffer mental anguish and emotional distress. Kadia's retaliation claim is limited to the period beginning January 30, 2019.

He seeks damages, injunctive relief, equitable relief, attorneys' fees, costs, and pre- and post-judgment interest.

The Commission filed its motion to dismiss this suit and attached evidence to support its arguments. Kadia responded and attached evidence of his own. The Commission filed a combined reply in support of its motion and objections to some of Kadia's evidence, including objections to statements made in two affidavits that he had attached to his response. After an oral hearing, the trial court sustained some of the Commission's evidentiary objections but overruled others and denied the motion to dismiss. The Commission now appeals.

**APPLICABLE LAW AND STANDARD OF REVIEW**

The TCHRA exists to execute the policies of Title VII of the Civil Rights Act of 1964, as amended; to "secure for persons in this state . . . freedom from discrimination in certain employment transactions, in order to protect their personal dignity"; and to "promote the interests, rights, and privileges of persons in this state," among other reasons. *See* Tex. Lab. Code § 21.001(1), (4), (8). Because of these purposes, Texas courts "consistently look to federal law to inform our construction and application of the TCHRA." *Alamo Heights ISD v. Clark*, 544 S.W.3d 755, 764 n.5 (Tex. 2018).

4

To accomplish its goals, the TCHRA makes unlawful many types of employment discrimination and retaliation. Under the discrimination heading,

> [a]n employer commits an unlawful employment practice if because of race [or] . . . national origin . . . the employer:
>
> > (1) fails or refuses to hire an individual . . . or discriminates in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment; or
> >
> > (2) limits, segregates, or classifies an employee . . . in a manner that would deprive or tend to deprive an individual of any employment opportunity or adversely affect in any other manner the status of an employee.

Tex. Lab. Code § 21.051. Under the heading of retaliation, "[a]n employer . . . commits an unlawful employment practice if the employer . . . retaliates or discriminates against a person who, under this chapter: (1) opposes a discriminatory practice; (2) makes or files a charge; (3) files a complaint; or (4) testifies, assists, or participates in any manner in an investigation, proceeding, or hearing." *Id.* § 21.055. Multiple instances of discriminatory or retaliatory acts can constitute multiple, discrete claims for relief: "Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify," and "[e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002); *see also Tillman v. Southern Wood Preserving of Hattiesburg, Inc.*, 377 F. App'x 346, 349 (5th Cir. 2010) ("Under [*National Railroad Passenger*], the April 12, 2005 reprimand, the alleged June 2005 pay-raise exclusion, and the denials of weekend overtime qualify as such discrete acts."); *Prairie View A & M Univ. v. Chatha*, 381 S.W.3d 500, 510 (Tex. 2012) ("In pay discrimination cases, the setting of an alleged discriminatory pay rate is a discrete act.").

Employers that are state-government entities are subject to the TCHRA, but they enjoy sovereign immunity, which deprives courts of subject-matter jurisdiction for suits against such entities unless immunity has been waived. *See Sampson v. University of Tex. at Austin*, 500 S.W.3d 380, 384 (Tex. 2016). "The TCHRA waives immunity, but only when the plaintiff states a claim for conduct that actually violates the statute." *Texas Dep't of Transp. v. Lara*, 625 S.W.3d 46, 52 (Tex. 2021). This results in the "intertwining" of the jurisdictional and merits inquiries in a TCHRA suit. *Alamo Heights ISD*, 544 S.W.3d at 763. "Immunity from suit may be asserted through a plea to the jurisdiction or other procedural vehicle, such as a motion for summary judgment." *Id.* at 770. Because whether a court has subject-matter jurisdiction is a question of law, we review de novo a trial court's ruling on a plea to the jurisdiction. *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225 (Tex. 2004).

"A jurisdictional plea may challenge the pleadings, the existence of jurisdictional facts, or both." *Id.* "When a jurisdictional plea challenges the pleadings, we determine if the plaintiff has alleged facts affirmatively demonstrating subject-matter jurisdiction." *Id.* We are to construe the pleadings liberally in the plaintiff's favor and in favor of jurisdiction, looking to the plaintiff's intent. *See City of Waco v. Lopez*, 259 S.W.3d 147, 150 (Tex. 2008); *Austin ISD v. Anderson*, No. 03-21-00286-CV, 2022 WL 3649357, at *3 (Tex. App.—Austin Aug. 25, 2022, no pet.) (mem. op.); *University of Tex. at Austin v. Kearney*, No. 03-14-00500-CV, 2016 WL 2659993, at *2 (Tex. App.—Austin May 3, 2016, pet. denied) (mem. op.).

But if the jurisdictional plea "challenges the existence of jurisdictional facts, we must move beyond the pleadings and consider evidence when necessary to resolve the jurisdictional issues, even if the evidence implicates both subject-matter jurisdiction and the

6

merits of a claim." *Alamo Heights ISD*, 544 S.W.3d at 770–71. When, as here, the defendant uses evidence of its own to support its jurisdictional plea, our

> standard of review mirrors that of a traditional summary judgment: "[i]f the plaintiffs' factual allegations are challenged with supporting evidence necessary to consideration of the plea to the jurisdiction, to avoid dismissal plaintiffs must raise at least a genuine issue of material fact to overcome the challenge to the trial court's subject matter jurisdiction."

*Id.* at 771 (quoting *Miranda*, 133 S.W.3d at 221). "In determining whether a material fact issue exists, we must take as true all evidence favorable to the plaintiff, indulging every reasonable inference and resolving any doubts in the plaintiff's favor." *Id.* "In doing so, however, we cannot disregard evidence necessary to show context, and we cannot disregard evidence and inferences unfavorable to the plaintiff if reasonable jurors could not." *Id.* If the evidence creates a fact question on the jurisdictional issue, then the trial court cannot grant the plea to the jurisdiction, and the fact issue will be resolved by the factfinder. *Miranda*, 133 S.W.3d at 227–28. But if the relevant evidence is undisputed or does not raise a fact question on jurisdiction, we rule on the plea as a matter of law. *See id.* at 228.

Violations of the TCHRA "can be established with either direct or circumstantial evidence." *Alamo Heights ISD*, 544 S.W.3d at 782. Generally, direct evidence is evidence of "what the defendant did and said," *Mission Consol. ISD v. Garcia*, 372 S.W.3d 629, 634 (Tex. 2012), that, without inference or presumption, establishes discriminatory intent, *Anderson*, 2022 WL 3649357, at *7. But "[b]ecause smoking guns are hard to come by, the three-part *McDonnell Douglas* burden-shifting framework enables an employee to establish discrimination" or retaliation "with circumstantial evidence." *See Alamo Heights ISD*, 544 S.W.3d at 782 & n.84 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973)).

7

Under the burden-shifting framework, "[i]f the employee can establish a prima facie case of discrimination, a rebuttable presumption of discrimination arises, which can alone sustain a discrimination claim." *Id.* at 782. "But the employer can defeat this presumption merely by producing evidence of a legitimate, nondiscriminatory reason for the disputed employment action." *Id.* "Once rebutted, the presumption disappears, and an employee lacking direct evidence cannot prove a statutory violation without evidence that the employer's stated reason is false and a pretext for discrimination." *Id.* "In both direct- and circumstantial-evidence cases, the burden of persuasion remains at all times with the employee." *Id.* "All elements of a TCHRA circumstantial-evidence claim are . . . jurisdictional." *Id.* at 783. "If the jurisdictional evidence does not negate or rebut the prima facie case, the ensuing aspects of the burden-shifting analysis are not implicated in the jurisdictional inquiry." *Id.* "But if . . . jurisdictional evidence rebuts the prima facie case, the entire *McDonnell Douglas* framework is fully implicated, and sufficient evidence of pretext and causation must exist to survive the jurisdictional plea." *Id.*

To invoke the TCHRA's immunity waiver, employees generally must have exhausted their administrative remedies. *See Prairie View A & M Univ.*, 381 S.W.3d at 517. This involves filing with the relevant federal or state agency an administrative "charge" complaining of discrimination or retaliation. *See National R.R. Passenger*, 536 U.S. at 110; *Lopez v. Texas State Univ.*, 368 S.W.3d 695, 701 (Tex. App.—Austin 2012, pet. denied). There is an exception to this jurisdictional prerequisite, which we address below.

DISCUSSION

**I. The trial court did not abuse its discretion by overruling the Commission's evidentiary objections—lack of personal knowledge and hearsay.**

We first consider the Commission's arguments about the evidence admitted into the record. *See Dallas Cnty. Hosp. Dist. v. Kowalski*, No. 05-21-00379-CV, 2023 WL 2782312, at *3 (Tex. App.—Dallas Apr. 5, 2023, pet. pending) (mem. op.). In its fifth issue, the Commission maintains that the trial court should have excluded certain statements made either in Kadia's affidavit[2] or in that of Bernice Willis,[3] both of which affidavits Kadia attached as evidence to his response to the motion to dismiss. The Commission's objections to one set of the statements at issue are based on the affiant's purported lack of personal knowledge to make the statements. Its objections to the second set are based on the hearsay rules.

**A. *The Kadia and Willis affidavits supply information supporting the affiants' personal knowledge to make the statements that the Commission challenges.***

Because the Commission adduced evidence to support its motion to dismiss and later objected to Kadia's evidence, the rules governing summary-judgment evidence apply. *See, e.g.*, *Edinburg Consol. Sch. Dist. v. Ayala*, No. 13-20-00570-CV, 2021 WL 5828945, at *5 (Tex. App.—Corpus Christi–Edinburg Dec. 9, 2021, no pet.) (mem. op.); *see also UT Health Sci. Ctr.-Houston v. Carver*, No. 01-16-01010-CV, 2018 WL 1473897, at *8 (Tex. App.—Houston [1st Dist.] Mar. 27, 2018, no pet.) (mem. op.) ("The procedure for a plea to the jurisdiction when

---

[2] Kadia and Willis actually signed "declarations" made under penalty of perjury. Such declarations may be used in lieu of affidavits in summary-judgment practice. Tex. Civ. Prac. & Rem. Code § 132.001(a). Because the summary-judgment rule uses "affidavit," *see* Tex. R. Civ. P. 166a(f), we will use that term for Kadia's and Willis's declarations, for ease of reference.

[3] Willis was the Director of Residential Services at Denton SSLC from December 2014 to January 2019.

evidence has been submitted . . . mirrors that of a traditional motion for summary judgment."). "We apply an abuse-of-discretion standard when reviewing a trial court's decision to admit or exclude summary-judgment evidence." *Guyaux v. Mitchell*, No. 03-20-00585-CV, 2021 WL 5855652, at \*6 (Tex. App.—Austin Dec. 10, 2021, no pet.) (mem. op.). "The same evidentiary standards that apply in trials control the admissibility of evidence" at summary judgment, and "[w]hether to admit or exclude evidence is a matter committed to the trial court's sound discretion." *Id.*

Among the rules for summary-judgment evidence are that "affidavits shall be made on personal knowledge" and that they "shall set forth such facts as would be admissible in evidence." *See* Tex. R. Civ. P. 166a(f). "The mere recitation that the affidavit is based on personal knowledge is inadequate if the affidavit does not positively show a basis for such knowledge." *Trostle v. Combs*, 104 S.W.3d 206, 214 (Tex. App.—Austin 2003, no pet.). Instead, the affidavit should show how the affiant has the personal knowledge asserted in the affidavit. *See Ermisch v. HSBC Bank USA, N.A.*, No. 03-16-00080-CV, 2016 WL 6575232, at \*2–3 (Tex. App.—Austin Nov. 4, 2016, pet. denied) (mem. op.); *Stucki v. Noble*, 963 S.W.2d 776, 780 (Tex. App.—San Antonio 1998, pet. denied). "The personal knowledge requirement is satisfied if the affidavit sufficiently describes the relationship between the affiant and the case so that it may be reasonably assumed that the affiant has personal knowledge of the facts stated in the affidavit." *Stucki*, 963 S.W.2d at 780.

The Commission objected to the following paragraph from Kadia's affidavit, arguing that it should be excluded for lack of personal knowledge:

> During the time [it] refused to promote me to a nursing position, [the Commission] recruited external applicants and promoted other newly graduated licensed

10

vocational nurses of American origin to nursing positions. None of the individuals [the Commission] hired for LVN positions at [Denton SSLC] instead of me are of Cameroonian origin. [Three specific such individuals] are . . . U.S. citizens of Nigerian origin. [Nine other specific such individuals] are Americans. These individuals were regarded by [Denton SSLC] staff as being Americans, and they have no characteristics associated with being of Cameroonian or African origin. For instance, they do not have African names or accents.

The trial court overruled the Commission's objection on the record during the oral hearing.[4]

The Commission says that the affidavit "fails to demonstrate how [Kadia] determined the staff members' national origins and their graduate status other than assuming that they were not Cameroonian." Kadia responds by pointing out that his affidavit elsewhere says that (1) he worked for the Commission as a direct support professional at the Denton SSLC from August 2016 to May 1, 2022; (2) he was then promoted to an LVN position; and (3) he has applied for about 50 Commission LVN positions, going through its requisition process and learning from other LVNs about features of the requisition process. And the affidavit includes the statement that Kadia has "personal knowledge of all facts stated herein[,] and they are all true and correct."

We agree with Kadia that his affidavit supplies information from which it can be reasonably inferred that he has personally learned about Commission recruiting, hiring, and promotion processes; the national origins and characteristics of the specified hires; and how Denton SSLC staff regards the hires. His years of work at Denton SSLC and his specific mention of speaking with other LVNs about the hiring process give rise to the reasonable inferences that he has learned how the process works and what people were hired when he himself was not hired. *See Texas Health & Hum. Servs. Comm'n v. De La Cruz*, No. 13-21-00082-CV, 2023 WL

---

[4] *See FieldTurf USA, Inc. v. Pleasant Grove ISD*, 642 S.W.3d 829, 838 (Tex. 2022) (allowing such oral rulings to preserve error for appellate review).

2422501, at *8 n.10 (Tex. App.—Corpus Christi–Edinburg Mar. 9, 2023, no pet.) (mem. op.) (TCHRA plaintiff's affidavit was supported by personal knowledge because affidavit "provides that [plaintiff] has personal knowledge of the facts contained therein, he worked for HHSC for 23 years, and three of the four comparators were coworkers"); *Fernea v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 559 S.W.3d 537, 551 (Tex. App.—Austin 2011, no pet.) ("An individual's position or job responsibilities can qualify her to testify to facts she learns through her actions and responsibilities at her company. A corporate employee is generally presumed to possess personal knowledge of facts that she would learn in the usual course of her employment without having to otherwise prove personal knowledge." (internal citation omitted)). The affidavit also gives rise to the reasonable inferences that Kadia talks with his coworkers, including the specified hires; with coworkers who know them or know about the hires; and with employees who know about the facility's processes. *See Stucki*, 963 S.W.2d at 780 (affidavits describing affiant's relationships with relevant facts can support reasonable assumptions about affiant's personal knowledge).

As for Willis's affidavit, the Commission objected to these statements for lack of personal knowledge: Denton SSLC "leadership opposed hiring African employees on multiple occasions. . . . When I tried to hire a second African applicant, [Denton SSLC] leadership again cancelled the requisition to prevent me from offering the position to that applicant. They later re-posted the requisition and interviewed and hired another applicant for that position." The trial court overruled the Commission's objections on the record during the oral hearing.

The Commission says that Willis's statements are "nothing more than supposition from a dissatisfied former employee," that "she fails to describe how her former position permitted her to discover that the leadership opposed hiring African applicants," and that "she failed to provide sufficient information to confirm who the applicant was and what position they applied

12

to" such that the Commission cannot judge whether she "could have had personal knowledge of this alleged hiring decision." Kadia responds by pointing to Willis's affidavit's statements that she "was the Director of Residential Services at [Denton SSLC] from December 2014 until January 2019," in which role she "was in the chain of management of Julius Kadia" and reported to "the Assistant Director of Programs, who reported to . . . the Facility Director," and that in her role, Willis interviewed and hired job candidates for the facility, including candidates of African descent, and discussed with management why some candidates were hired and not others.

We again agree with Kadia. Willis's affidavit provides information from which it could be reasonably inferred that she would know about hiring practices at the facility and the specific results of failed hires whose processes she was involved with. *See Fernea*, 559 S.W.3d at 551; *Stucki*, 963 S.W.2d at 780. We conclude that the trial court was within its discretion to overrule the Commission's lack-of-personal-knowledge objections, and we thus overrule this portion of the Commission's fifth issue.

**B.** ***The purported inadmissible-hearsay statements by Commission employees were made within their scope of employment and thus admissible.***

Hearsay is generally inadmissible. *See* Tex. R. Evid. 802. "'Hearsay' means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Tex. R. Evid. 801(d). Certain statements made by opposing parties are not hearsay, *see* Tex. R. Evid. 801(e)(2), and there are otherwise many exceptions to the rule against hearsay, *see, e.g.*, Tex. R. Evid. 803, 804. "Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule." Tex. R. Evid. 805.

13

The Commission objected to a statement in the Kadia affidavit and a statement in the Willis affidavit on the grounds that each is hearsay within hearsay without a hearsay exception to support each level of hearsay in the statement. From the Kadia affidavit, the Commission objected to this statement: "Prior to that, I was also informed by my manager, . . . Willis, that" the Denton SSLC Facility Director "had instructed" the facility's Director of Nursing "not to offer me a nursing position because" the Facility Director "was upset about the complaints I filed." The trial court overruled the objection in its written order denying the motion to dismiss.

The Commission says of the Willis-to-Kadia statement that it is hearsay and cannot benefit from the hearsay exception for statements by opposing parties because "Willis lacked the authority to make any LVN hiring decisions and, therefore, any statement related to LVN hiring decisions would be outside the scope of her employment." Kadia responds that when Willis made the statement, Willis "was the Director of Residential Services and was in Kadia's chain of management," in which "capacity, Kadia met with her to discuss his concern that he was suffering discrimination and retaliation at work." These features, Kadia says, mean that the statement "was made within the scope of her employment in his chain of management pursuant to [the Commission]'s policy prohibiting discrimination and retaliation and encouraging employees to discuss their concerns with appropriate management."

One category of statements excluded from the definition of hearsay involves statements "offered against an opposing party and . . . [that] w[ere] made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Tex. R. Evid. 801(e)(2)(D). If a statement meets this exclusion's terms, then it does not matter that the employee "had no authority to speak for the principal"—the statement is still admissible. *See City of Stephenville v. Texas Parks & Wildlife Dep't*, 940 S.W.2d 667, 677 (Tex. App.—Austin 1996,

14

writ denied). The parties dispute the relevant scope of Willis's employment—specifically, whether it had to encompass LVN hiring decisions to encompass the matter of discrimination or retaliation against Kadia when he was applying to become an LVN. But precedent from our sister courts shows that the scope of employment for government-entity employees' supervisors, or for relevant human-resources personnel, can encompass the kinds of statements made by Willis. *See Dallas Cnty. Hosp. Dist.*, 2023 WL 2782312, at *4–5; *County of El Paso v. Aguilar*, 600 S.W.3d 62, 79 (Tex. App.—El Paso 2020, no pet.). We are persuaded that these authorities correctly state the law on this evidentiary issue and conclude that the trial court was within its discretion to admit the Willis-to-Kadia statement.

For the rest of this statement from Kadia's affidavit, the Commission does not identify the additional levels of hearsay to which it was objecting. It is the Commission's burden on appeal to construct its necessary arguments, and without one for what the additional hearsay would be, we cannot hold that the trial court abused its discretion by overruling the hearsay-within-hearsay objection. *See Beebe v. City of San Antonio ex rel. CPS Energy*, 673 S.W.3d 691, 703 (Tex. App.—San Antonio 2023, pet. denied).[5]

From the Willis affidavit, the Commission objected to this statement: The Director of Nursing "approached me about . . . Kadia's interest in nursing positions at" Denton SSLC, and "[d]uring that conversation, . . . the Director of Nursing[] told me that she had talked to" the Facility Director about "Kadia's applications and" the Facility Director "instructed" the Director

---

[5] The only statements that would seem to be the additional levels were communications from the Facility Director to the Director of Nursing instructing the latter not to offer Kadia nursing positions because the Facility Director was upset with Kadia for filing complaints. These statements as we go on to discuss below are admissible as admissions by a party opponent.

15

of Nursing that "Kadia would never get an LVN position at a[n] [SSLC] because of his history of filing complaints."[6] The trial court overruled the objection in its written order on appeal here.

The hearsay arguments regarding this statement are the same as those about the statement from the Kadia affidavit. For similar reasons, we reject the arguments. The part of this statement that was made by the Director of Nursing was made by a supervisor who because of her position at the facility would have knowledge of discriminatory or retaliatory practices within the facility affecting Kadia. *See Dallas Cnty. Hosp. Dist.*, 2023 WL 2782312, at \*4–5; *County of El Paso*, 600 S.W.3d at 79. The same is true of the Denton SSLC Facility Director, for the portion of the statement made by the Facility Director to the Director of Nursing. *See Dallas Cnty. Hosp. Dist.*, 2023 WL 2782312, at \*4–5; *County of El Paso*, 600 S.W.3d at 79. In all, we reject the Commission's evidentiary arguments, hold that the trial court did not abuse its discretion by overruling these evidentiary objections, and overrule the Commission's fifth appellate issue.

**II.     The Commission's opening trio of jurisdictional arguments mostly fail but do require some claims to be repleaded if Kadia wishes to pursue them.**

In its first issue, the Commission raises a trio of jurisdictional challenges.[7]

*A.     Exhaustion of remedies and the* **Gupta** *exception*

The first challenge depends on a multi-step argument arising out of a TCHRA plaintiff's need to exhaust administrative remedies. Overall, the Commission posits that Kadia

---

[6] This statement was made some time before February 2019 because Willis heard the statement while in her position at Denton SSLC and left that position in January 2019.

[7] These jurisdictional challenges are separate from the issues further below about whether Kadia has established a prima-facie case for his claims and whether he has rebutted the purportedly legitimate, nondiscriminatory, and nonretaliatory reasons offered by the Commission for its acts and omissions made the subject of this suit.

may not advance any discrimination or retaliation claim that is based solely on acts or omissions that occurred outside of the two 180-day periods of preserved claims created by Kadia's two administrative charges. In step one of the argument, the Commission says that all of Kadia's claims rely on allegations of *both* discrimination and retaliation, meaning that in the Commission's view, every claim pleaded by Kadia is both a discrimination claim and a retaliation claim and not simply one or the other. *Cf. Alamo Heights ISD*, 544 S.W.3d at 763–64 (comparing and contrasting discrimination and retaliation claims); *Harris Ctr. for Mental Health & IDD v. McLeod*, No. 01-20-00838-CV, 2022 WL 1632173, at *5 (Tex. App.—Houston [1st Dist.] May 24, 2022, no pet.) (mem. op.) (claims may be based on both discrimination and retaliation allegations). The Commission next points out that to exhaust administrative remedies under the TCHRA, claims of discrimination or retaliation generally must be supported by an administrative charge filed by the plaintiff with a relevant agency and that such charges preserve complaints about discrete acts of discrimination or retaliation usually only if the acts took place no more than 180 days before the filing of the charge. *See National R.R. Passenger*, 536 U.S. at 110; *Lopez*, 368 S.W.3d at 701. The two charges on which Kadia bases claims were filed on July 29, 2019, and November 2, 2020, meaning that the 180-day periods that the charges cover are (a) January 30 to July 29, 2019, and (b) May 6 to November 2, 2020. The Commission thus argues that any claims arising out of acts or omissions occurring outside of those 180-day periods cannot move forward. Then the Commission argues that Kadia's claims may not benefit from the "*Gupta* exception," which exempts retaliation claims from any requirement that a new claim-preserving charge be filed when the claims of retaliation "grow[] out of an earlier charge." *See Harris Ctr. for Mental Health & IDD*, 2022 WL 1632173, at *5; *accord Metropolitan Transit Auth. v. Douglas*, 544 S.W.3d 486, 498–99 (Tex. App.—Houston [14th Dist.] 2018, pet. denied); *see generally Gupta v. East Tex.*

17

*State Univ.*, 654 F.2d 411 (5th Cir. Unit A Aug. 1981). The Commission argues this because it conceives of all of Kadia's claims as based on discrimination allegations as well as retaliation ones and the *Gupta* exception would save claims based only on retaliation. *See Harris Ctr. for Mental Health & IDD*, 2022 WL 1632173, at *5. The result of the Commission's multi-step argument would be that the only claims of Kadia's that may proceed are those that are based on acts or omissions that occurred during one of the two 180-day periods.

> 1.    *No discrimination claims need be dismissed under the Commission's argument because no such claim depends on Commission actions from outside the preserved periods.*

Kadia responds in part by disputing the Commission's characterization of the claims in his live petition.[8] Because we must construe Kadia's live petition, we note that "[w]hen, as here, no special exception is made, we liberally construe the pleadings in the pleader's favor." *Bos v. Smith*, 556 S.W.3d 293, 306 (Tex. 2018). Kadia represents on appeal that all of his discrimination claims are based only on acts or omissions falling within the two 180-day periods that his administrative charges cover: "Kadia's controlling petition asserts discrimination claims *only for* defendant's discriminatory failure and refusal to promote him *during the exhausted periods*. Kadia *expressly does not combine* unexhausted discrimination claims with his retaliation claims in the periods following his [two] charge filings."[9] (Emphases added.) Based on this

---

[8] Although some of the Commission's arguments rely on earlier pleadings, we rely only on Kadia's live pleading, which is his Second Amended Petition and which superseded his prior pleadings. *See* Tex. R. Civ. P. 65; *Edcouch-Elsa ISD v. Cabrera*, No. 13-21-00365-CV, 2022 WL 3257377, at *2 (Tex. App.—Corpus Christi–Edinburg Aug. 11, 2022, no pet.) (mem. op.).

[9] Kadia said much the same in his trial-court response to the motion to dismiss: "Kadia . . . expressly limited his discrimination claims based on [the Commission]'s failure and refusal to promote him to the administratively exhausted periods of January 30, 2019, through July 29, 2019, and May 6, 2020, through November 2, 2020." The Commission's appellant's brief

representation and the requirement to construe Kadia's live pleading liberally in his favor, and because Kadia is the master of his complaint, *see Heard v. Moore*, 101 S.W.3d 726, 728 (Tex. App.—Texarkana 2003, pet. denied) ("It is well established that plaintiffs are the masters of their suit regarding the claims and parties they choose to pursue." (citing *Texas Alcoholic Beverage Comm'n v. Macha*, 780 S.W.2d 939, 941 (Tex. App.—Amarillo 1989, writ denied))); *accord Texas Vein & Vascular v. Martinez*, Nos. 13-14-00176-CV, 13-14-00346-CV, 2015 WL 5233342, at * 5 (Tex. App.—Corpus Christi–Edinburg Sept. 3, 2015, pet. denied) (mem. op.), we conclude that Kadia has not pleaded any discrimination claims that are based on acts or omissions outside of the two preserved periods and thus conclude that the Commission's first issue does not support dismissing any of Kadia's discrimination claims. *Cf. Harris Ctr. for Mental Health & IDD*, 2022 WL 1632173, at *6 (TCHRA plaintiff who "d[id] not limit her discrimination claims to pre-charge allegations" could not rely on *Gupta* exception for claims made outside preserved periods).

2. *Many of the retaliation claims survive the exhaustion and* Gupta *arguments, but others must be repleaded if Kadia wishes to pursue them.*

This leaves retaliation claims that are based on acts or omissions falling outside of the two preserved periods. Kadia represents on appeal that his "retaliation claims arise only from his protected activities in 2019 and 2020." But this statement does not focus on the *Commission's* actions about which he pleads retaliation claims, *see* Tex. Lab. Code § 21.055 (retaliation claim is based on employer's unlawful employment practice), and some parts of 2019 and 2020 are not covered by the applicable preserved periods—(a) January 30 to July 29, 2019, and (b) May 6 to November 2, 2020. If Kadia has pleaded any retaliation claim that rests only on Commission acts

---

accepts that Kadia "claims to no longer be seeking relief for discriminatory failure to promote claims for the unexhausted time periods."

19

or omissions occurring outside of these two periods, even if occurring otherwise in 2019 or 2020, then Kadia must rely on the *Gupta* exception for subject-matter jurisdiction over any such claim.

To decide this portion of the Commission's issue, we must construe Kadia's live petition, which we liberally construe in his favor. *See Bos*, 556 S.W.3d at 306. Doing so, we see these allegations from the live petition as potentially pleading acts or omissions supporting retaliation claims when the acts or omissions could fall outside the preserved periods[10]:

1. "Kadia's supervisor has . . . instructed him to complete tasks that would violate facility policies and could endanger staff and residents and result in terminable offenses. In January 2019, [Denton SSLC] wrote Kadia up for performing such an assigned task but later rescinded the warning letter after Kadia threatened to file another civil rights complaint and provided evidence that a supervisor instructed him to complete the task."

2. "In March 2019, Kadia refused to complete an assignment that would violate facility policies because his supervisor refused to provide written confirmation of her directive, so Kadia was disciplined and deprived of employment benefits, salary increases, and consideration for promotion for a period of 18 months."

3. "After Kadia began to complain about unlawful discrimination and retaliation, [Denton SSLC] refused to allow Kadia to work overtime, while making overtime hours available to other employees. Other employees are allowed to exceed the maximum overtime hours allowed by facility policies; and during the same weeks Kadia is allowed to work only minimal or no overtime. In July 2019, Kadia's immediate supervisor requested that Kadia work an overtime shift because the facility was short-staffed. But another supervisor came in about an hour later and instructed Kadia to go home, leaving the unit short-staffed, and began calling other employees at their homes, asking them to cover the shift."

4. During Denton SSLC staffing shortages stemming from the COVID-19 pandemic, "Kadia knew he was being under-utilized, and wrote a letter to the nursing director expressing his willingness and desire to assist with nursing duties, but management rejected his assistance, choosing instead to continue their discriminatory and retaliatory conduct despite the pandemic."

---

[10] The live petition otherwise pleads purportedly retaliatory acts or omissions that fall wholly within the preserved periods, for example: "On July 10, 2020, [the Commission] issued Kadia a written warning after Kadia reported verbal abuse by one of his co-workers."

20

5. "Kadia has applied for about twenty open nursing positions at [Denton SSLC] since 2017 and has never been interviewed for any of those positions. Instead, [Denton SSLC] has recruited external applicants and has promoted other newly graduated American licensed vocational nurses to nursing positions, while denying Kadia similar promotions." The Commission "continues to refuse to promote Kadia to a nursing position although Kadia is a licensed vocational nurse and Kadia continues to work in a support position for which he is overqualified. Since Kadia has filed this case, however, [the Commission]'s discrimination and retaliation against Kadia has increased in magnitude." "Kadia engaged in protected activity when he opposed discriminatory and retaliatory treatment based on his race and national origin. Kadia has repeatedly been denied promotions and compensation . . . in retaliation for his complaints about discrimination and retaliation. The defendant's retaliatory actions . . . have deprived Kadia of wages, employment benefits, and promotional opportunities."

6. "[M]anagement at [Denton SSLC] has repeatedly encouraged Kadia to resign, both implicitly, by means of discriminatory and retaliatory conduct, and explicitly."

7. "Additionally, after filing this case, Kadia continues to be bullied and harassed at work, assigned tasks that violate [Denton SSLC] and [Commission] policies, written up based on frivolous and untrue allegations, and denied compensation for overtime, bonuses, and merit increases."

We address these sets of allegations one by one.[11]

Regarding the first set, the January 2019 write-up, we conclude that the pleaded allegations, when construed liberally in Kadia's favor, state acts by the Commission that could have occurred during the portion of January 2019 that falls within the preserved periods. These allegations therefore are sufficiently pleaded in the face of the Commission's exhaustion argument. We thus reject the Commission's exhaustion challenge to these allegations.

---

[11] The Commission's arguments under its first issue concern the sufficiency of Kadia's pleadings. We see no argument under its first issue that either exhaustion or the *Gupta* exception were not met based on a challenge by the Commission to the jurisdictional facts.

21

Regarding the second set—allegations that Kadia was disciplined and then for 18 months deprived of employment benefits, salary increases, and consideration for promotion, all due to his March 2019 refusal to complete an assignment—these allegations must rely on acts or omissions outside the preserved periods because the periods cover at most about 12 months. Thus, insofar as the allegations rest on acts or omissions from outside the preserved periods, Kadia must rely on the *Gupta* exception. Its standard is "straightforward": "a retaliation claim grows out of a discrimination charge" only "when the plaintiff claims that the defendant retaliated against her for filing" an administrative charge. *See Metropolitan Transit Auth.*, 544 S.W.3d at 498–99. The allegations in this instance do not meet this standard—they grow out of Kadia's refusal to complete an assignment, not his filing of an administrative charge. Therefore, to the extent these allegations rest on acts or omissions occurring during the preserved periods, they survive the Commission's exhaustion argument, but to the extent they rest on acts or omissions occurring outside the preserved periods, the Commission's argument is correct, and no such claim may proceed. We thus accept in part and reject in part the Commission's exhaustion challenge to these allegations.

For the third set of allegations, about overtime, if Kadia wishes to maintain a claim for any denials of overtime that occurred outside of the preserved periods, he must replead to state sufficient facts to bring any such claim within the *Gupta* exception. Separately, although this set of allegations otherwise states acts by the Commission that could have occurred during the portion of July 2019 that falls within the preserved periods,[12] the July 2019 alleged denial of overtime fails to surmount a separate jurisdictional hurdle, addressed below.

---

[12] The motion to dismiss accepts that at least one of Kadia's alleged denials of overtime "falls within the exhausted time period."

22

Fourth, for the allegations about rejecting Kadia's offers to work as a nurse during staff shortages, Kadia's live pleading does not specify when the alleged retaliatory rejections took place. Claims based on any such rejections that took place during the preserved periods survive the Commission's argument, but claims based on any such rejections that did not take place during the preserved periods cannot proceed unless saved under *Gupta*. Next, applying *Gupta* to any rejections falling outside the preserved periods, we observe that aside from the word "retaliatory," nothing in the allegations suggests that rejecting Kadia's assistance with nursing duties stemmed from his having filed an administrative charge. *See id.* If Kadia wishes to advance any such claims, he must replead them on remand to plead allegations to bring the claims within the *Gupta* exception. *See Miranda*, 133 S.W.3d at 226–27 ("If the pleadings do not contain sufficient facts to affirmatively demonstrate the trial court[']s jurisdiction but do not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency and the plaintiffs should be afforded the opportunity to amend.").

The fifth set of allegations concerns refusals to hire or promote Kadia for LVN positions. Kadia sought these positions by applying to numbered job postings made available by the Commission, with some postings seeking only one hire and others seeking multiple. The Commission accepts that Kadia's purported rejections under the following numbered job postings fall within the preserved periods: 407640, 407665, 417661, and 417663. But it argues that Kadia cannot advance claims for retaliatory failure to hire or promote for the following 31 numbered job postings because the relevant acts and omissions fall outside the preserved periods: 412525, 421584, 428339, 428345, 430743, 446331, 450263, 476353, 478865, 479271, 487689, 494328, 494333, 498873, 498874, 499232, 500734, 500744, 501943, 507504, 507534, 507562, 507639, 507648, 507673, 507682, 507710, 507712, 507714, 507716, and 507881. Kadia's response is

23

twofold. First, his appellate brief marshals evidence showing that claims for failure to hire or promote for three of the job postings—430743, 446331, and 450263—do indeed fall within the preserved periods. Although he applied to those postings in April 2020, which is outside the preserved periods, the postings remained open for hiring decisions into the second preserved period. His pleadings are therefore sufficient for these three job postings to survive the Commission's exhaustion argument without need of invoking the *Gupta* exception. Second, Kadia argues that his retaliation claims based on the rejections from the rest of the 31 challenged postings "grow out of his July 29, 2019, and November 2, 2020, charges of discrimination," thus meeting the *Gupta* exception. His live petition supports this argument via these allegations: "Kadia engaged in protected activity when he opposed discriminatory and retaliatory treatment based on his race and national origin. Kadia has repeatedly been denied promotions and compensation . . . in retaliation for his complaints about discrimination and retaliation." Construing these allegations liberally, which we must, we conclude that the "complaints about discrimination and retaliation" to which the allegations refer encompass his two administrative charges, which means that he has pleaded that he was retaliated against when rejected under these job postings for having filed an administrative charge, thus pleading into the *Gupta* exception. *See Metropolitan Transit Auth.*, 544 S.W.3d at 498–99.

Sixth is Kadia's bare allegation that Denton SSLC management has encouraged him to resign by retaliatory conduct. The allegation does not provide detail about when this has occurred and if it occurred during the preserved periods, whether the retaliation was for his having filed an administrative charge. *See Bos*, 556 S.W.3d at 306 ("[A] liberal construction 'does not require a court to read into a petition what is plainly not there.'" (quoting *Heritage Gulf Coast Props., Ltd. v. Sandalwood Apartments, Inc.*, 416 S.W.3d 642, 658 (Tex. App.—Houston

24

[14th Dist.] 2013, no pet.))). Thus, if Kadia wishes to maintain a separate claim based on his being encouraged to resign, then he must plead sufficient facts to show either exhaustion or the *Gupta* exception. *See Miranda*, 133 S.W.3d at 226–27.

Finally, we have Kadia's allegation that "after filing this case," he has been "bullied and harassed at work, assigned tasks that violate [Denton SSLC] and [Commission] policies, written up based on frivolous and untrue allegations, and denied compensation for overtime, bonuses, and merit increases." Because he filed the suit on June 11, 2020, at least some of these allegations state acts or omissions falling within the preserved periods. However, for any such allegation falling outside the preserved periods about which he wishes to maintain a retaliation claim for bullying, harassment, assigned tasks, write-ups, or denied compensation, he must replead to state facts to bring the claim within the *Gupta* exception. *See id.*

In all, we sustain in part and overrule in part this portion of the first issue.

## B.     *Kadia advances no claim for job postings from 2017 at another SSLC.*

In its second jurisdictional challenge, the Commission raises numbered job postings that were both for positions at an SSLC other than Denton and closed before Kadia's preserved periods ever began.[13] Because Kadia disclaims any claims for discrimination or retaliation for Commission acts or omissions that occurred before January 30, 2019, we need not address this issue. *See* Tex. R. App. P. 47.1.

---

[13] These are job postings 349792, 350138, 352879, and 362804.

25

## C.      The Commission's mootness challenge fails.

In its third jurisdictional challenge, the Commission relies on having hired Kadia as an LVN after extending him a job offer on April 12, 2022. It argues that because his job application leading to this offer was submitted on January 16, 2022, he jurisdictionally may not advance claims for failure to hire or promote under job postings that Kadia applied to any time after January 16, 2022. The Commission argues that any post-January 16, 2022 claims are, in its words, "moot" because of the April 12, 2022 job offer.[14] This portion of the Commission's first issue revisits Kadia's claims for failure to hire or promote stemming from 12 job postings—500734, 507534, 507562, 507639, 507648, 507673, 507682, 507710, 507712, 507714, 507716, and 507881. The latest date that Kadia applied to any of these job postings was January 24, 2022.

"A case may become moot as to some claims or issues, but remain 'live' as to others." *Glassdoor, Inc. v. Andra Grp., LP*, 575 S.W.3d 523, 530 (Tex. 2019). Mootness involves the loss of "a justiciable controversy between the parties or when the parties cease to have 'a legally cognizable interest in the outcome.'" *State ex rel. Best v. Harper*, 562 S.W.3d 1, 6 (Tex. 2018) (quoting *Williams v. Lara*, 52 S.W.3d 171, 184 (Tex. 2001)). "Mootness occurs when events make it impossible for the court to grant the relief requested or otherwise 'affect the parties' rights or interests.'" *Id.* (quoting *Heckman v. Williamson County*, 369 S.W.3d 137, 162 (Tex. 2012)).

As relevant here, Kadia is seeking damages for his claims for failure to hire or promote. And the record shows that the Commission sometimes offers jobs to applicants as fast

---

[14] The Commission states this portion of its first issue in terms of "mootness," but the sole case that the Commission cites to support its position concerns the "continuing-violation doctrine," which applies to claims for hostile work environments. *See Heath v. Board of Supervisors for S. Univ. & Agric. & Mech. Coll.*, 850 F.3d 731, 736, 738 (5th Cir. 2017). Kadia in the trial court abandoned any claims for hostile work environment, so we will analyze the Commission's argument as one of mootness.

as within two weeks after the applicant applied. So even if Kadia applied to all 12 job postings at issue here on January 24, 2022, the Commission still could have offered him any of the positions by the beginning of February 2022, which precedes his actual job offer of April 12, 2022. If everything Kadia pleads is true, *see Texas Dep't of Agric. v. Wild Boar Meats, L.L.C.*, No. 03-17-00514-CV, 2018 WL 3748677, at *3 (Tex. App.—Austin Aug. 8, 2018, pet. denied) (mem. op.) (taking as true plaintiff's pleaded factual assertions when reviewing mootness challenge), then he still was denied at least two months of pay and benefits stemming from the Commission's failure to hire or promote him under these 12 postings. This means that there is a live controversy about these 12 postings for which Kadia retains a cognizable interest. *See State ex rel. Best*, 562 S.W.3d at 6. His claims stemming from these postings thus are not moot, and we overrule this portion of the Commission's first issue.

### III. Kadia raised a fact issue on a prima-facie case of discrimination.

In its second issue, the Commission maintains that "Kadia failed to make a prima-facie showing of race or national origin discrimination based on failure to promote." (Formatting altered.) A prima-facie case of racial or national-origin discrimination in a failure to hire or promote requires evidence that (1) the plaintiff is a member of a protected class, (2) the plaintiff was qualified for the promotion or employment position at issue, (3) the plaintiff was subject to an adverse employment action, and (4) the plaintiff was treated less favorably than was a similarly situated person who is not a member of the protected class or the employer after rejecting the plaintiff continued to seek applicants with the plaintiff's qualifications.[15] *See*

---

[15] The Commission's position is that the fourth element cannot be proven by evidence that the employer after rejecting the plaintiff continued to seek applicants with the plaintiff's

27

*Anderson*, 2022 WL 3649357, at *8; *Texas Dep't of Agric. v. Latting*, No. 03-17-00603-CV, 2018 WL 1404501, at *3 (Tex. App.—Austin Mar. 21, 2018, no pet.) (mem. op.); *Texas Dep't of Crim. Just. v. Cooke*, 149 S.W.3d 700, 705 (Tex. App.—Austin 2004, no pet.). The Commission's arguments are limited to the fourth element and to four of the job postings about which Kadia pleads claims.[16] Kadia responds to the Commission's second issue in part by arguing that he put forward circumstantial evidence raising a fact issue on his claims of discrimination. If he came forward with evidence to raise a fact issue on the challenged element, then the applicable burden would shift to the Commission. *See Alamo Heights ISD*, 544 S.W.3d at 782.

### 1.    *Job posting 407640*

The record shows that job posting 407640 was created to fill four LVN positions. Kadia applied to the posting in April 2019, one person was hired, and Commission personnel were unaware if anyone else was hired for the other three positions. Commission discovery responses identify the candidate hired as white. Kadia was not hired. Although the posting remained open through July 2019 and the hiring manager continued to make hiring decisions from its applicant pool through September 2019, Kadia was never considered for this posting according to deposition testimony, with Commission records further showing him as "Not Selected for [an] Interview" by

---

qualifications. But we have stated that formulation of the fourth element at least in *Texas Department of Criminal Justice v. Cooke*, and that decision remains good law. *See* 149 S.W.3d 700, 705 (Tex. App.—Austin 2004, no pet.).

[16] The Commission accompanies these arguments with others on the separate topic of whether Commission hiring decisionmakers personally knew Kadia's race or national origin when considering his job applications. But the elements for circumstantial evidence of a prima-facie case do not require Kadia to show the hiring decisionmakers' personal knowledge of his race or national origin. *See Austin ISD v. Anderson*, No. 03-21-00286-CV, 2022 WL 3649357, at *8 (Tex. App.—Austin Aug. 25, 2022, no pet.) (mem. op.); *Texas Dep't of Agric. v. Latting*, No. 03-17-00603-CV, 2018 WL 1404501, at *3 (Tex. App.—Austin Mar. 21, 2018, no pet.) (mem. op.); *Texas Dep't of Crim. Just.*, 149 S.W.3d at 705.

May 2019.  The record thus shows that for this posting, (a) Kadia was treated less favorably than was the white person who was hired and (b) the Commission after rejecting Kadia continued to seek applicants with an LVN license like Kadia had.  Kadia thus raised a fact issue under the fourth element for this posting.

### 2. *Job posting 407665*

The record shows that Kadia applied for LVN job posting 407665 in April 2019, the posting closed in July 2019, and the hiring manager could continue to select applicants from the posting's pool through September 2019.  Kadia's application for the position was never screened, but others' were.  The record elsewhere shows that there is always an open job posting for LVNs with the Commission because workers in the discipline are in short supply.  The record thus shows that the Commission rejected Kadia out of hand and continued to seek LVN applicants.  Kadia thus raised a fact issue under the fourth element for this job posting.

### 3. *Job posting 417661*

The record shows that job posting 417661 was created to fill three open positions for LVNs, one person was hired, and Commission personnel were unaware if anyone else was hired for the other two positions.  Kadia applied to the posting in May 2019.  The one person hired was hired before Kadia applied, but the posting otherwise remained open until September 2019, and the hiring manager could continue to make hiring decisions from the posting's pool until November 2019.  Kadia was not considered, but the Commission still sought other LVNs to fill the positions sought to be filled by the posting.  The record thus shows that the Commission after rejecting Kadia continued to seek applicants with an LVN license like Kadia had.  Kadia thus raised a fact issue under the fourth element for this job posting.

29

### 4.    *Job posting 417663*

The record shows that Kadia applied for LVN job posting 417663 in May 2019, the posting closed in July 2019, and the hiring manager could continue to select applicants from the posting's pool through September 2019. Even though one applicant was hired for this posting, and that hire was made before Kadia applied, other applicants for this posting may have been hired otherwise from "clone" job postings[17] made from this one. The record thus shows that the Commission after rejecting Kadia continued to seek applicants with an LVN license like Kadia had. Kadia thus raised a fact issue under the fourth element for this job posting.

In all, the record supplies evidence from which Kadia has raised a fact issue under the fourth element of a prima-facie case of discrimination for failure to hire or promote. We thus overrule the Commission's second issue.

## IV.    For his challenged retaliation claims, Kadia demonstrated a materially adverse employment action but only some of the necessary causal links.

In its third issue, the Commission maintains that "Kadia failed to make a prima facie showing of retaliation for failure to promote, compensation, and reassignment." (Formatting altered.) To establish a prima-facie case of retaliation, employees must show that (1) they engaged

---

[17] "Cloning" in this context refers to a tool for hiring multiple applicants from a single job posting. A Commission deputy director of human resources gave this affidavit testimony:

> Within [the Commission], job postings can either be perpetual postings or regular postings, depending on the needs of the agency. A regular posting remains open for 10 workdays. Perpetual postings can remain open for up to 182 days. When a person is hired into a perpetual posting, the posting is "cloned" and with a new, unique job posting number for the person hired. For that reason, there are sometimes two job posting numbers associated with each position—the original job posting number and the clone posting number. . . . In my experience, hiring managers often prefer to use perpetual postings because they do not have to initiate a new job posting every 10 workdays, or keep extending the closing date.

30

in an activity protected by the TCHRA, (2) they experienced a material adverse employment action, and (3) a causal link exists between the protected activity and the adverse action. *Alamo Heights ISD*, 544 S.W.3d at 782.

The Commission in its opening brief limits its arguments to the four job postings just discussed and to Kadia's retaliation claim based on temporary reassignment to the "facility jail." It argues that Kadia (a) for his "facility jail" claim has not adduced evidence under the second and third elements and (b) for the job-posting claims has not adduced evidence under the third element. In its reply brief, the Commission expands its position under the third element to address 27 more job postings about which Kadia pleads claims and that were the subject of analysis above about exhaustion and the *Gupta* exception. Kadia applied to these job postings between April 2020 and January 2022, inclusively. Because the subject-matter-jurisdiction and merits inquiries for Kadia's claims are intertwined, *see id.* at 763, we take up the new position that the reply brief raises, *see City of Fort Worth v. Shilling*, 266 S.W.3d 97, 105 & n.6 (Tex. App.—Fort Worth 2008, pet. denied) (addressing subject-matter-jurisdiction argument raised in post-submission brief in appeal involving TCHRA retaliation claim).

## A. *Kadia has shown that his temporary reassignment to the "facility jail" was materially adverse.*

"Materially adverse 'means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Alamo Heights ISD*, 544 S.W.3d at 788 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). "This objective materiality requirement is necessary 'to separate significant from trivial harms.'" *Id.* (quoting *Burlington N. & Santa Fe Ry.*, 548 U.S. at 68). "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often

31

take place at work and that all employees experience." *Id.* (quoting *Burlington N. & Santa Fe Ry.*, 548 U.S. at 68). On the other hand, this standard for retaliation claims is more lenient than the "ultimate employment decision" standard that is used for many discrimination claims: "[T]he *Burlington* standard . . . is both 'more lenient' and 'broader than for [substantive] discrimination, in that such actions are not limited to tangible employment acts,' but rather encompass any acts that might dissuade a reasonable worker from making or supporting a charge of discrimination." *Texas Dep't of Pub. Safety v. Williams*, No. 03-08-00466-CV, 2010 WL 797145, at *6 (Tex. App.— Austin Feb. 19, 2010, no pet.) (mem. op.) (quoting *Johnson v. TCB Constr. Co.*, 334 F. App'x 666, 671 (5th Cir. 2009) (per curiam)).

"This objective standard is fact specific 'because the significance of any given act of retaliation will often depend upon the particular circumstances'"—"[c]ontext matters." *Metropolitan Transit Auth.*, 544 S.W.3d at 494 (quoting *Navy v. College of the Mainland*, 407 S.W.3d 893, 900 (Tex. App.—Houston [14th Dist.] 2013, no pet.)). We must review all the circumstances. *See Montgomery County v. Park*, 246 S.W.3d 610, 615 (Tex. 2007). Still, several factors—which have not been held to be exclusive—are useful in assessing material adversity: the effects the underlying act had on the employee's (1) prestige, (2) opportunity for advancement, (3) pay, (4) core job duties, and (5) ability to obtain outside employment. *Adeshile v. Metropolitan Transit Auth.*, No. 14-12-00980-CV, 2014 WL 3734140, at *2 (Tex. App.—Houston [14th Dist.] Jan. 16, 2014, pet. denied) (mem. op.) (interpreting *Montgomery County*, 246 S.W.3d at 615–16).

Kadia adduced evidence showing the following. The "facility jail" is a room where an employee is temporarily assigned to work while the employee is under investigation for alleged abuse or neglect of residents. While assigned there, the employee essentially can do no work all day. This is why some employees assigned to the "facility jail" instead use accrued leave time

32

rather than reporting for work at the room. The room is widely known as the "facility jail" among facility employees. Although employees are ordinarily "released" from the "jail" after the abuse-or-neglect investigation about them is complete, when such an investigation about Kadia ended on September 18, 2020, he was kept assigned to the "jail" through October 21, 2020. His assignment to the "jail" kept him from working overtime as normal, thus resulting in lost pay.

We conclude that Kadia has shown that his ongoing assignment to the "facility jail," especially after his abuse-or-neglect investigation ended, was a materially adverse employment action. Even temporary actions can be materially adverse. *See, e.g.*, *Metropolitan Transit Auth. v. Douglas*, 651 S.W.3d 122, 138–39 (Tex. App.—Houston [14th Dist.] 2021, no pet.). The assignment affected his pay by preventing him from working overtime as normal. *Texas Dep't of Pub. Safety*, 2010 WL 797145, at *6 (action was materially adverse in part because it resulted in lost overtime); *see also Adeshile*, 2014 WL 3734140, at *2 (pay as relevant factor). And such an assignment's widespread recognition among employees as being sent to "jail" can be seen as a blow to prestige or professional standing. *See City of Austin v. Baker*, No. 03-16-00607-CV, 2018 WL 3060044, at *3 (Tex. App.—Austin June 21, 2018, pet. denied) (mem. op.) (action was materially adverse in part because it "negatively impacted [employee]'s professional standing"); *see also Adeshile*, 2014 WL 3734140, at *2 (prestige as relevant factor). Assigning Kadia to the "facility jail" thus "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Alamo Heights ISD*, 544 S.W.3d at 788 (quoting *Burlington N. & Santa Fe Ry.*, 548 U.S. at 68). We overrule this portion of the Commission's third issue.

33

**B.** ***Kadia has made causal-link showings for his "facility jail" claim and the claims stemming from the four job postings raised in the Commission's opening brief.***

Turning next to the Commission's arguments under retaliation's third element for both the "facility jail" and four job-posting claims raised in its opening brief, we note that "[t]he causation standard for the *McDonnell Douglas* prima-facie-case element is not onerous and can be satisfied merely by proving close timing between the protected activity and the adverse action." *Id.* at 782. It is "significantly" easier to prove than but-for causation, which becomes relevant if "the employer provides evidence of a legitimate reason for the adverse action."[18] *See id.*; *Avila v. United Parcel Serv., Inc.*, No. 03-18-00233-CV, 2018 WL 4100854, at \*10 (Tex. App.—Austin Aug. 29, 2018, pet. denied) (mem. op.) ("The causal link required at the prima facie stage does not rise to the level of a 'but for' standard."). "An employee need not prove that the protected activity is the sole factor motivating the employer's adverse employment action in order to satisfy the causal element." *Brizendine v. Texas Dep't of Health*, No. 03-04-00197-CV, 2004 WL 2814319, at \*2 (Tex. App.—Austin Dec. 9, 2004, no pet.) (mem. op.). Evidence of these matters helps us decide whether a causal link has been shown: (1) whether the employer followed usual policy or procedure in carrying out the challenged action, (2) the employee's disciplinary record, (3) the temporal proximity between the challenged action and the employee's protected action, (4) knowledge of the employee's protected activity by the employer's relevant decisionmakers, (5) differing treatment between the employee and similarly situated others, and (6) whether the employer's stated reason for its action was false. *See Texas Parks & Wildlife Dep't v. Gallacher*, No. 03-14-00079-CV, 2015 WL 1026473, at \*6 (Tex. App.—Austin Mar. 4, 2015, no pet.) (mem. op.); *Donaldson v. Texas Dep't of Aging & Disability Servs.*, 495 S.W.3d 421, 444 (Tex. App.—

_____

[18] We address below the Commission's arguments that implicate but-for causation.

Houston [1st Dist.] 2016, pet. denied); *Serur v. Churchill Forge Props.*, No. 03-03-00501-CV, 2004 WL 1404141, at *4 (Tex. App.—Austin June 24, 2004, no pet.) (mem. op.). For temporal proximity alone to support the necessary causal link, the proximity must be "very close." *Gallacher*, 2015 WL 1026473, at *7 (quoting *Amsel v. Texas Water Dev. Bd.*, 464 F. App'x 395, 402 n.8 (5th Cir. 2012) (per curiam)). The employer's decisionmakers' knowledge of the employee's protected activity is not enough on its own. *Serur*, 2004 WL 1404141, at *4.

For his "facility jail" retaliation claim, Kadia adduced evidence showing the following. He was first reassigned to the "jail" on September 3, 2020, two days after he had reported a coworker for alleged abuse or neglect.[19] Employees are assigned to the "facility jail" while they are being investigated for allegations of abuse or neglect. But although the investigation that led to Kadia's September 3 reassignment was concluded by September 18, he was kept in "jail" until October 21. The Commission decisionmakers who decided to keep Kadia there included the Denton SSLC Facility Director, and later email correspondence among the Facility Director and others says that Kadia was kept in "jail" because "[t]here were several issues involving him including either civil rights case and/or a lawsuit." The evidence that Kadia adduced thus raises a fact issue about the necessary causal link because it shows Commission decisionmakers deviating from normal procedure by keeping him in "jail" past when the abuse-or-neglect investigation had ended, a very close temporal proximity between Kadia's making a report of his own and the beginning of his "jail" stint,[20] and knowledge of Kadia's "civil

---

[19] And just under three months after he filed this suit, in June 2020.

[20] Plus temporal proximity to the June 2020 filing of this suit. *See Avila v. United Parcel Serv., Inc.*, No. 03-18-00233-CV, 2018 WL 4100854, at *10 (Tex. App.—Austin Aug. 29, 2018, pet. denied) (mem. op.) (citing *Haire v. Board of Supervisors of La. State Univ. Agric. & Mech. Coll.*, 719 F.3d 356, 368 (5th Cir. 2013), for proposition "that temporal proximity of three months

rights case and/or . . . lawsuit" by some of the relevant decisionmakers. We thus reject the Commission's causal-link challenge to a prima-facie case for the "facility jail" retaliation claim.

For his four job-posting claims addressed in the Commission's opening brief, Kadia adduced evidence of the following. He applied to the postings in April or May 2019. In February 2019,[21] he and the Facility Director had signed a mediated Resolution Agreement that resolved a prior discrimination complaint by Kadia and included the Director's agreement to meet with Kadia about LVN positions. But the Director would instead go on to tell Kadia, in Kadia's words, "that they would not hire me and encouraged me to look for LVN jobs elsewhere." Relatedly, Kadia's manager had told him that the Director had instructed an executive nurse "not to offer [Kadia] a nursing position because [the Director] was upset about the complaints [Kadia] filed." The evidence that Kadia adduced thus raises a fact issue about the necessary causal link because it provides evidence to support knowledge of Kadia's protected activities by some of the relevant decisionmakers, temporal proximity, and the falsity of any stated reasons for not hiring Kadia from the job postings he applied to because the real reason was that the Director was upset with Kadia's complaints. We thus reject the Commission's causal-link challenge from its opening brief regarding a prima-facie case for the group of four job-posting retaliation claims.

---

between filing of EEOC charge and adverse employment action in addition to gradual changes in plaintiff's job duties was sufficient to establish causation element of prima facie case").

[21] *See Brizendine v. Texas Dep't of Health*, No. 03-04-00197-CV, 2004 WL 2814319, at *3 (Tex. App.—Austin Dec. 9, 2004, no pet.) (mem. op.) ("Depending on the facts and circumstances, two months may be sufficiently proximate to establish a *prima facie* causal link between an employee's protected activity and an adverse employment action.").

**C.**     ***Kadia has made a causal-link showing for three of the 27 job postings raised in the Commission's reply brief but cannot make such a showing for the other 24.***

Finally, for the 27 job postings addressed in the Commission's reply brief, each was a subject of the analysis above under the Commission's exhaustion and *Gupta* arguments. For purposes of our analysis, we divide the 27 into two groups: (1) the three postings—430743, 446331, and 450263—to which Kadia applied on April 6, 2020, but whose supporting allegations place the claims within the preserved periods and (2) the remaining 24, to which Kadia applied between July 11, 2021, and January 24, 2022, inclusively.

Retaliation claims arising from the three postings in the first group do not need to rely on the *Gupta* exception because Kadia's petition supports that claims arising from these postings are based on Commission acts or omissions from the second preserved period. Thus, to make his causal-link showing, Kadia could link these alleged failures to hire or promote to any protected activity and need not rely only on linking them to his first administrative charge. He has adduced evidence raising a fact issue on "causal link" by way of statements made by a Denton SSLC manager while the three job postings were open that the manager wanted Kadia "removed from my unit because he causes a lot of problems" by "fil[ing] complaints against [the manager] and [her] BCs[22] about a lot of things because he is African." During the same period, he filed his original petition in this suit. He thus raised a fact issue on differing treatment between himself and similarly situated LVN applicants, temporal proximity, and the falsity of Commission decisionmakers' stated reasons for not hiring him under the three job postings because the real reason was that his manager wanted him removed from the unit for making complaints based on national-origin discrimination.

---

[22]  Other evidence suggests that "BC" stands for "building coordinator."

37

The second group of job postings involves postings 476353, 478865, 479271, 487689, 494328, 494333, 498873, 498874, 499232, 500734, 500744, 501943, 507504, 507534, 507562, 507639, 507648, 507673, 507682, 507710, 507712, 507714, 507716, and 507881. The earliest Kadia applied to any of these postings was on July 11, 2021, but he had filed his second administrative charge over eight months earlier, on November 2, 2020. To reiterate, because the alleged failures to hire or promote under these postings fall outside the two preserved periods, Kadia must rely on the *Gupta* exception, which requires him to rely on his administrative charges, to show the necessary causal links. But the time between the closest administrative charge and the earliest that he applied to any of the 24 postings is over eight months. Such a gap has been held to be insufficient to prove the necessary causal link for a prima-facie case. *See Goudeau v. National Oilwell Varco, L.P.*, 793 F.3d 470, 478–79 (5th Cir. 2015) (gap of eight-to-ten months insufficient to show causal link for prima-facie case of retaliation); *Jackson v. Honeywell Int'l, Inc.*, 601 F. App'x 280, 286–87 (5th Cir. 2015) ("We have found a five month period between the protected activity and the adverse employment action insufficient to establish a causal link."). Kadia thus cannot make a causal-link showing for a prima-facie case of retaliation for failure to hire or promote for these 24 postings, and we sustain the Commission's third issue only to that extent and overrule the rest of it.

**V.     The Commission mounts a partially successful challenge to Kadia's claims at the jurisdictional steps of falsity and pretext and but-for causation.**

   *A.     Some of Kadia's claims surmount the jurisdictional hurdle that the Commission's proffered legitimate reasons raise, but others do not.*

In a portion of its fourth issue, the Commission maintains that "Kadia failed to rebut [its] legitimate, nondiscriminatory and non-retaliatory reasons for all employment actions." (Formatting altered.) The employer in a discrimination or retaliation suit such as this one can

defeat the presumption of unlawful conduct that the plaintiff's prima-facie case gives rise to by "merely . . . producing evidence of a legitimate, nondiscriminatory reason for the disputed employment action." *Alamo Heights ISD*, 544 S.W.3d at 782; *see id.* (same analytical framework applies to both discrimination and retaliation claims). Once the employer does so, the presumption in the employee's favor "disappears, and an employee lacking direct evidence cannot prove a statutory violation without evidence that the employer's stated reason is false and a pretext for discrimination." *Id.* The plaintiff must create a fact question on the ultimate issue—whether it was discrimination or retaliation, as the case may be, that caused the adverse employment action. *See Baker*, 2018 WL 3060044, at *4. The plaintiff can do so, as relevant, "by showing either that he was clearly better qualified than the employee who was selected or that the employer's proffered explanation for its decision was false or unworthy of credence." *Texas Health & Hum. Servs. v. Sepulveda*, 668 S.W.3d 856, 868 (Tex. App.—El Paso 2023, no pet.).

1. *Kadia raised a fact issue on falsity and pretext for some—but not all—of the failures to hire or promote under job postings that the Commission raises as having been based on legitimate reasons.*

Under this first portion of its fourth issue, the Commission points to its purported legitimate, nondiscriminatory reasons for failing to hire or promote Kadia when he applied to job postings 407640, 407665, 412525, 417661, 417663, 421584, 446331, and 450263. For the first posting, the Commission produced evidence that the one candidate hired was hired before Kadia ever applied and that Kadia's job application lacked detail about his work experience, which made the application of the candidate ultimately hired better. To respond, Kadia points to evidence showing that posting 407640 sought to fill four job openings, not just one; the Commission does not know who else was hired to fill the other three openings; hiring decisions under the posting

39

could have been made for another five months or so after Kadia applied; other applicants to the posting were still considered even after the one hire was made; at least one of those considered applicants might have been hired; and although Kadia met the posting's screening criteria, he was not considered at all. We conclude that Kadia has raised a fact issue about whether the Commission's offered explanation actually was false and was thus a pretext for a discriminatory or retaliatory decision. *See Sepulveda*, 668 S.W.3d at 868; *Baker*, 2018 WL 3060044, at *4.

For job posting 407665, the Commission offered evidence that the posting was ultimately canceled without a hire and that Kadia's application did not show whether he had the length of LVN work experience that the hiring manager was looking for or whether his LVN experience had included some of the tasks that a successful candidate would have needed experience in. Kadia points to evidence showing that, contrary to the Commission's offered reason, the posting was not canceled for all applicants as it was for Kadia. That evidence shows that the hiring manager made screening decisions on candidates months after Kadia applied and that some of the candidates screened were noted internally as either "Failed Pre-Screening" or "Not Selected for Interview." But the note for Kadia says, "Requisition Cancelled." Kadia's evidence also includes deposition testimony by Commission personnel showing that the Commission is virtually always seeking to fill LVN positions because employees in that discipline are in "critical shortage" and the positions involve high turnover and are difficult to fill. And the evidence shows that Kadia had LVN experience. We conclude that Kadia has raised a fact issue about whether the Commission's offered explanation actually was false—for example, that hires actually were made from this posting or from clones of it to fill the critical shortage of LVNs— and was thus a pretext for a discriminatory or retaliatory decision not to consider Kadia at all. *See Sepulveda*, 668 S.W.3d at 868; *Baker*, 2018 WL 3060044, at *4.

40

For job posting 412525, the Commission offered evidence that the candidate ultimately hired was better qualified than Kadia and that Kadia applied only after the candidate hired had already begun the job. Kadia does not point to any evidence to contest the fact of timing that the hire was already made before he even applied, *see Apache Corp. v. Davis*, 627 S.W.3d 324, 335 & n.28 (Tex. 2021) (but-for-causation standard requires plaintiff to show that unlawful employment action "would not have occurred when it did" but for the unlawful retaliation (emphasis removed) (citing *Alamo Heights ISD*, 544 S.W.3d at 782–83, 790)), so we conclude that any claim for retaliatory failure to hire or promote under posting 412525 cannot proceed.

For job posting 417661, the Commission offered evidence that the candidate hired was more qualified than Kadia and was hired before Kadia ever applied. Kadia points to evidence showing that for a couple of months after the candidate was hired, and also after Kadia applied, the Commission continued screening, interviewing, and considering applicants under the purportedly already-filled posting. The posting remained open for about two more months after a later candidate was interviewed even after the earlier candidate had been hired, and the hiring manager could make hiring decisions from the posting's applicant pool for about two more months after that, with the Commission looking to fill multiple openings from the same posting. Kadia still was not considered. We conclude that Kadia has raised a fact issue about whether the Commission's offered explanation actually was false and was thus a pretext for a discriminatory or retaliatory decision. *See Sepulveda*, 668 S.W.3d at 868; *Baker*, 2018 WL 3060044, at *4.

For job posting 417663, the Commission offered evidence that the candidate hired was more qualified than Kadia, the candidate accepted the position before Kadia applied, and no other candidate was hired for any position via the posting. Kadia points to evidence showing that the hiring manager could continue making hiring decisions from this posting's applicant pool for

41

about four months after Kadia applied and that Commission personnel admitted both that Kadia matched the posting's initial-screening criteria and that other applicants may have been hired from clones of this posting. We conclude that Kadia has raised a fact issue about whether the Commission's offered explanation was false and thus a pretext for a discriminatory or retaliatory decision. *See Sepulveda*, 668 S.W.3d at 868; *Baker*, 2018 WL 3060044, at *4.

For job posting 421584, the Commission offered evidence that the candidate hired was more qualified than Kadia and that no other candidate was hired from the posting or from any clone of it. Kadia points to evidence that Commission personnel do not know why Kadia's application was not even considered despite his meeting both the initial-screening criteria and the preferred criteria for the job. We conclude that Kadia has raised a fact issue about whether the Commission's offered explanation actually was false and was thus a pretext for a discriminatory or retaliatory decision. *See Sepulveda*, 668 S.W.3d at 868; *Baker*, 2018 WL 3060044, at *4.

For job posting 446331, the Commission offered evidence that the position was for a Specialty Clinic Nurse whose duties would include managing a clinic. It also offered evidence that the candidate ultimately hired had years more experience than Kadia had and that Kadia had no experience managing clinics. Kadia points to evidence that he met the position's criteria for initial screening and that the ultimate hire had left the employment-history section of her application blank. But the Commission's evidence otherwise shows that its decisionmakers received information from the hire about her employment history from a supplemental document submitted to the Commission's application portal, like a résumé. We conclude that Kadia's evidence does not raise a fact issue about the Commission's reasons being false or a pretext for making the hire that it did. *See Price v. Federal Express Corp.*, 283 F.3d 715, 721 n.2 (5th Cir. 2002) ("[T]he promotion of a better qualified applicant is a legitimate and nondiscriminatory

reason for preferring the successful applicant over the rejected employee who claims that the rejection was discriminatory." (quoting *Jefferies v. Harris Cnty. Cmty. Action Ass'n*, 693 F.2d 589, 590 (5th Cir. 1982) (per curiam))).

For job posting 450263, the Commission offered evidence that the candidate ultimately hired had weeks more experience as an LVN than Kadia had and that Kadia (at that time) had been only a part-time LVN while the candidate hired had worked as one full-time. It also offered evidence that no other candidate was hired from this posting or any clone of it. Kadia points to evidence that Commission personnel do not know why the candidate hired was interviewed and hired while Kadia was not considered. Also according to Kadia's evidence, Commission personnel acknowledged that Kadia had more relevant work experience than the candidate ultimately hired and had "been practicing as a nurse longer," giving Kadia "more experience and qualifications than" the person hired. We conclude that Kadia has raised a fact issue about whether the Commission's offered explanation actually was false and was thus a pretext for a discriminatory or retaliatory decision. *See Sepulveda*, 668 S.W.3d at 868; *Baker*, 2018 WL 3060044, at *4.

In all, we sustain in part and overrule in part this portion of the Commission's fourth issue focused on these job postings.

> 2. *Kadia did not raise a fact issue on falsity and pretext to support his allegation of a denial of overtime in July 2019.*

Also under the heading of this first portion of its fourth issue, the Commission advances a purportedly legitimate reason for an occasion of its having denied Kadia overtime. Kadia pleaded that in July 2019, a supervisor "instructed Kadia to go home, leaving the unit short-staffed, and began calling other employees at their homes, asking them to cover the shift,"

even though Kadia's immediate supervisor had shortly before asked that he "work an overtime shift because the facility was short-staffed." To raise a legitimate reason for the denial of overtime, the Commission offered evidence that facility policy prohibited employees from working more than three consecutive days of overtime and Kadia on the day in question had at that point reached the limit. Kadia does not point to any evidence to rebut the Commission's evidence from its overtime policy, so we conclude that he has not raised a fact issue on falsity or pretext for the July 2019 instance of denying overtime. We sustain this portion of the Commission's fourth issue focused on July 2019 overtime.

> 3.     *The Commission has not produced evidence of a legitimate reason for keeping Kadia in the "facility jail" past when the investigation about him had ended, and, in any event, Kadia raised a fact issue on falsity and pretext concerning both his initial reassignment to the "jail" and his being kept there past when the investigation had ended.*

Finally under this first portion of its fourth issue, the Commission advances purportedly legitimate reasons for temporarily reassigning Kadia to the "facility jail." The Commission offered evidence that facility policy requires employees to be temporarily reassigned to the "facility jail" while they are under investigation for alleged abuse or neglect of a resident and Kadia was first temporarily reassigned for that very reason. It also offered evidence that he was not assigned back to his normal duties after that investigation ended because the Commission's investigator believed that Kadia was interfering with an abuse-or-neglect investigation involving a different employee by talking with witnesses to the allegations involving that employee. As evidence that this behavior was unacceptable, the Commission relies on statements of its policies forbidding employees from "discuss[ing] any details of an investigation with anyone other than an investigator or law enforcement." But the Commission has fallen short

44

of producing evidence of a legitimate reason for keeping Kadia in the "facility jail." While its policy for temporarily reassigning employees there in the first place is tied to abuse-or-neglect investigations into that employee, the policies it relies on for having kept Kadia there in no way mention temporary reassignment to the "facility jail." Kadia otherwise received a Written Warning for the conduct that the Commission asserts required him to be kept in the "facility jail" past when the policy regarding investigated employees required him to be there. We thus conclude that the Commission has not produced evidence of a legitimate reason for keeping Kadia reassigned to the facility jail.

Even without this conclusion, we otherwise conclude that Kadia raised a fact issue on falsity and pretext for both his initial temporary reassignment to the "jail" and his being kept there even after the investigation concerning him had ended. Kadia points to evidence showing that the allegation of abuse or neglect made against him by Commission personnel occurred just a day or two after he had reported a colleague for alleged abuse or neglect and that the allegation against him is what led to the temporary reassignment. He also points to evidence that, as laid out above, the Denton SSLC Facility Director received a report that Kadia was kept in "jail" because "[t]here were several issues involving him including either civil rights case and/or a lawsuit." We thus conclude that Kadia has raised a fact issue about whether the Commission's offered explanations for both temporarily reassigning him to the "facility jail" and keeping him there past when policy would normally allow were false and were thus a pretext for a discriminatory or retaliatory decision. *See Sepulveda*, 668 S.W.3d at 868; *Baker*, 2018 WL 3060044, at *4. We overrule this portion of the Commission's fourth issue focused on the "facility jail" claim.

45

**B.** ***Kadia raised fact issues on but-for causation for the retaliation claims that the Commission challenges.***

In the remainder of its fourth issue, the Commission—focusing on retaliation claims—maintains that "Kadia cannot establish 'but-for' his protected activity he would not have been subject to [the Commission]'s alleged 'materially adverse' retaliatory actions: promotion, compensation, and reassignment." (Formatting altered.) For retaliation claims, after the employer produces evidence of its legitimate reason, and beyond the plaintiff's pretext/falsity burden, the plaintiff also "must prove the adverse action would not have occurred 'but for' the protected activity." *Alamo Heights ISD*, 544 S.W.3d at 782. "In evaluating but-for causation evidence . . . , we examine all of the circumstances, including" several identified factors: "temporal proximity between the protected activity and the adverse action, knowledge of the protected activity, expression of a negative attitude toward the employee's protected activity, failure to adhere to relevant established company policies, discriminatory treatment in comparison to similarly situated employees, and evidence the employer's stated reason is false." *See id.* at 790. Although useful, these factors ultimately do not supplant the core standard, which requires the plaintiff to show that the unlawful employment action "would not have occurred when it did" but for the unlawful retaliation. *See Apache*, 627 S.W.3d at 335 & n.28 (emphasis removed) (citing *Alamo Heights ISD*, 544 S.W.3d at 782–83, 790).

  *1.*   *Kadia raised a fact issue on but-for causation for his claims for retaliatory failure to hire or promote, including by resorting to the "cat's paw" theory.*

The Commission advances arguments against but-for causation for the retaliation claims for failure to hire or promote as a whole category, rather than arguing job posting by job

46

posting.[23] It argues that to the extent Kadia relies on temporal proximity alone to establish but-for causation, his protected activities occurred too long before "the preserved retaliatory adverse actions alleged in Kadia's Petition began in 2019." It next argues that Kadia "has failed to identify and link any protected activity to any specific adverse actions and alleges that he was generally retaliated against because of all the complaints he filed." Finally, it argues that because the particular hiring managers across all the job postings lacked knowledge of his protected activities, he cannot show that the Commission's decisions not to hire or promote him, which were made at least in part by the particular hiring managers, were the but-for result of retaliation.

Kadia responds in part by marshaling evidence of Commission personnel's retaliatory intent and its relationship to the alleged failures to hire or promote. Kadia points to evidence, recounted above, that the Facility Director instructed the Director of Nursing that Kadia "would never get an LVN position at [an SSLC] because of his history of filing complaints." Thus, Kadia has not merely pleaded "that he was generally retaliated against because of all the complaints he filed," as the Commission argues—he has adduced evidence of categorical retaliation. The Facility Director's statement applies to the entire category of job postings about which Kadia pleads claims, injecting into each one a fact issue about whether the Facility Director's anger over Kadia's undisputedly protected activities was the reason that he was not hired or promoted in each instance. The statement bears at least some temporal relationship with Kadia's claims: Willis knew of this statement by the Facility Director while Willis worked for the Commission and was Kadia's supervisor, and Willis's employment ended in January 2019— before Kadia applied to any of the postings about which he pleads claims and during or just before

---

[23] We need not reach the Commission's but-for-causation arguments about Kadia's claims for denials of overtime, which have failed at earlier steps. *See* Tex. R. App. P. 47.1.

the start of the first preserved period. In at least one instance, also recounted above, the Director of Nursing met with a hiring manager who wanted to hire Kadia, and the result was that Kadia was no longer considered for the position. Kadia also points to evidence from a July 3, 2019 Commission Discrimination Complaint Determination memo, in which a building coordinator is reported as saying "that every time management makes a decision[,] [Kadia] is 'hollering' discrimination, and this is making all of the supervisors uncomfortable." And an August 2020 discrimination complaint reports a Commission unit director as saying both that she wanted Kadia "removed from [her] unit because he causes a lot of problems over here" and that the "type of problems" that he causes are that "[h]e files complaints against [her] and [her] BCs about a lot of things because he is African, and it always comes back that the complaints are not true."

Kadia also responds, more specifically, to the Commission's arguments about the difference between particular hiring managers' knowledge about his protected activities and other Commission personnel's knowledge of them and, more broadly, about but-for causation, using the "cat's paw" theory. This theory is a viable theory of causation for retaliation claims. *See Zamora v. City of Houston*, 798 F.3d 326, 332–33 (5th Cir. 2015). Under the theory, "a plaintiff must establish that the person with a retaliatory motive somehow influenced the decisionmaker to take the retaliatory action," which in other words means that "a plaintiff must show that the person with retaliatory animus used the decisionmaker to bring about the intended regulatory action." *Id.* at 331; *accord In re Parkland Health & Hosp. Sys. Litig.*, No. 05-17-00670-CV, 2018 WL 2473852, at *11 (Tex. App.—Dallas June 4, 2018, no pet.) (mem. op.). We conclude that Kadia has raised a fact issue under the cat's-paw theory's two elements—(1) a supervisor motivated by retaliatory animus took acts intended to cause Kadia an adverse employment action and (2) those acts were a but-for cause of his not being hired or promoted. *See Zamora*, 798 F.3d at 333.

48

We have recounted the evidence that raises a fact issue under both elements. The Facility Director instructed the Director of Nursing that Kadia would never be hired as an LVN because of his undisputedly protected activities of making complaints, and the Director of Nursing met at least once with a hiring manager who wanted to hire Kadia—even though the Director of Nursing was not usually involved in similar hiring decisions—and the result was that Kadia was no longer considered for the position. The evidence also supports that the Director of Nursing asked to meet with all other hiring managers who might receive a job application from Kadia, all of whom reported to that Director. Kadia then was not hired or promoted under over four dozen job postings, even though he met the positions' screening criteria and basic qualifications.

Kadia has thus raised a fact issue on but-for causation for his claims for retaliatory failure to hire or promote. He adduced evidence to support the cat's-paw theory of but-for causation—the Facility Director's embargo on hiring or promoting Kadia filtered at least two levels downward in the Commission's reporting structure to the hiring managers who declined to hire him, and those effects lasted for over three years. Similarly, Kadia's evidence benefits from the but-for-causation factors of expression of a negative attitude toward his protected activity, failure to adhere to relevant established company policies, discriminatory treatment in comparison to similarly situated employees, and evidence that the employer's stated reason is false. *See Alamo Heights ISD*, 544 S.W.3d at 790. We overrule this portion of the Commission's fourth issue focused on but-for causation for the claims for retaliatory failure to hire or promote.

2. *Kadia raised a fact issue on but-for causation for the "facility jail" claim.*

Finally, the Commission argues against but-for causation for the "facility jail" claim. Its arguments generally track its arguments for its purported legitimate reasons for

temporarily reassigning Kadia to the "jail" in the first place and then keeping him there past when the abuse-or-neglect investigation about him had ended.

Kadia in turn relies on evidence that the allegation against him that put him in "jail" in the first place came only a day or two after he had reported a colleague for abuse or neglect and less than three months after he filed this suit. He also relies on the email involving the Facility Director and others in which it was reported that Kadia was kept in "jail" because "[t]here were several issues involving him including either civil rights case and/or a lawsuit." Plus, evidence shows that even the Commission's reason that Kadia was kept in "jail"—because of interference in another investigation—was a moving target. A "review" group of Commission personnel decided that Kadia should be kept in "jail" past when the investigation ended, but when they met the only reason given against Kadia was that he had refused to sign an in-service-training form about a change in supervision levels at the facility, meaning that the interference reason had not been raised. Later, Commission personnel testified in a deposition that Kadia was kept in "jail" because he was interfering with an investigation into the abuse-or-neglect allegations against *himself*. Then the Commission later identified the reason as potential interference into an abuse-or-neglect allegation against someone else. Finally, Kadia was released from reassignment to the "jail" one day after he applied for a temporary restraining order in this suit.

We conclude that Kadia has raised a fact issue on but-for causation for his retaliation claim for assignment to the "facility jail," including being kept there after the abuse-or-neglect investigation about him had ended. Evidence supports concluding that he was first reassigned there shortly after making an abuse-or-neglect complaint about another worker, he was kept there either for a reason not supported by Commission policy or for ever-changing reasons, and he was released not in response to the end of any alleged interference but in response

50

to a request for injunctive relief in this suit. *See Apache*, 627 S.W.3d at 335 & n.28; *Alamo Heights ISD*, 544 S.W.3d at 790. We overrule this remaining portion of the Commission's fourth issue.

**CONCLUSION**

We reverse the trial court's order denying the Commission's motion to dismiss, and render judgment, in the following respects: we dismiss with prejudice Kadia's claims (a) that he was disciplined and then for 18 months deprived of employment benefits, salary increases, and consideration for promotion, all in response to his March 2019 refusal to complete an assignment, insofar as these claims rely on acts or omissions occurring outside the preserved periods; (b) for retaliatory failure to hire or promote under job postings 412525, 446331, 476353, 478865, 479271, 487689, 494328, 494333, 498873, 498874, 499232, 500734, 500744, 501943, 507504, 507534, 507562, 507639, 507648, 507673, 507682, 507710, 507712, 507714, 507716, and 507881; and (c) that the Commission denied him overtime in July 2019.

We reverse the order, and remand for further proceedings, in the following respects: Kadia must replead (a) his claim for any denials of overtime that occurred outside of the preserved periods to state sufficient facts to bring the claim within the *Gupta* exception; (b) his claim for the denial of his request to work as a nurse during staffing shortages insofar as the claim relies on acts or omissions occurring outside of the preserved periods to bring the claim within the *Gupta* exception; (c) his claim based on being encouraged to resign to state sufficient facts to show either exhaustion of remedies or the *Gupta* exception; and (d) his retaliation claim for bullying, harassment, assigned tasks, write-ups, or denied compensation, any of which occurred after November 2, 2020, to bring the claim within the *Gupta* exception.

51

We affirm the rest of the order and remand for further proceedings consistent with this opinion.

_____
Chari L. Kelly, Justice

Before Justices Baker, Kelly, and Smith

Affirmed in Part; Reversed and Rendered in Part; Reversed and Remanded in Part

Filed:   June 28, 2024